MISSOURIANS TO PROTECT THE INITIATIVE PROCESS, a Not–For–Profit Corporation of Missouri, et al., Plaintiffs–Respondents,

v.

Roy D. BLUNT, in his capacity as Secretary of State of the State of Missouri, Defendant–Appellant,

and

Yes For Ethics Committee, Intervenor–Appellant.

No. 73148.

Supreme Court of Missouri, En Banc.

Oct. 29, 1990.

Dissenting Opinion Dec. 7, 1990.

Rehearing Denied Dec. 18, 1990.

William L. Webster, Atty. Gen., James B. Deutsch, Simon B. Buckner, Asst. Attys. Gen., Jefferson City, for defendant–appellant.

John E. Bardgett, Mark H. Levison, Clayton, for plaintiffs-respondents.

Martin M. Green, H. Todd Iverson, Clayton, for amicus curiae League of Women Voters.

Alex Bartlett, Harvey M. Tettlebaum, Jefferson City, for intervenor-appellant.

PER CURIAM.

This is an appeal from an injunction prohibiting the appellant Secretary of State from placing proposed constitutional amendment "No. 5" on the November 6, 1990, ballot. The appeal was initially filed in this Court but, due to a lack of jurisdiction,[1] the cause was transferred to the Missouri Court of Appeals, Western District. Because questions of statewide concern were involved, this Court granted transfer before opinion. Rule 83.06, *Mo.Const. art. V, § 10*. The circuit court judgment is affirmed.

### I.

On May 9, 1990, the "Yes for Ethics Committee" submitted to the Secretary of State a proposed initiative petition to amend the state's constitution. The petition, if adopted, would repeal §§ 2, 9, 16, 20, 20(a), 21, 22, 23 and 25 of article III, would adopt nine new sections in lieu thereof, and would adopt three new sections, 54, 55 and 56 of article III. The Secretary delivered the proposal to the Attorney General. Both officials "review[ed] the petition for sufficiency as to form" and approved it. § 116.332.1.[2] The Secretary of State also drafted a proposed ballot title and transmitted it to the Attorney General. The Attorney General approved and returned the ballot title to the Secretary of State on May 11, 1990. § 116.334.2. On September 1, 1990, the Secretary of State certified that a sufficient number of voters had signed the petitions to require that the initiative proposal be placed on the ballot at the November 1990 general election. § 116.150.1.

On September 5, 1990, plaintiffs filed an action in the circuit court of Cole County. Among other relief, they sought to enjoin the Secretary of State from placing the initiative proposal on the November ballot. The "Yes for Ethics Committee" intervened.

The trial court entered judgment on October 11, 1990, enjoining the Secretary of State from placing the measure on the ballot. The judgment was based on several grounds. Among the trial court's conclusions, it determined that the initiative petition proposal does not comply with the

---

1. Section 116.200.3, RSMo 1986, purports to grant a party to an action such as this the right to appeal to the Supreme Court. However, our appellate jurisdiction is constitutionally defined and limited to specific situations, none of which exists here. *See Mo.Const. art. V, § 3.*

2. References to statutes are to RSMo 1986 unless otherwise noted.

provisions of article III, § 50, requiring that petitions for constitutional amendments contain no "more than one subject and matters properly connected therewith." The appeal has been expedited.

## II.

Before reaching the issues presented in this appeal, it is important to make some general observations regarding the initiative process provided by the constitution. Nothing in our constitution so closely models participatory democracy in its pure form. Through the initiative process, those who have no access to or influence with elected representatives may take their cause directly to the people. The people, from whom all constitutional authority is derived, have reserved the "power to propose and enact or reject laws and amendments to the Constitution." *Mo.Const. art. III, § 49.* When courts are called upon to intervene in the initiative process, they must act with restraint, trepidation and a healthy suspicion of the partisan who would use the judiciary to prevent the initiative process from taking its course. Constitutional and statutory provisions relative to initiative are liberally construed to make effective the people's reservation of that power. *State ex rel. Blackwell v. Travers,* 600 S.W.2d 110, 113 (Mo.App. 1980). Statutes that place impediments on the initiative power that are inconsistent with the reservation found in the language of the constitution will be declared unconstitutional.

The people, speaking with equal vigor through the same constitution, have placed limitations on the initiative power. That those limitations are mandatory is clear and explicit.

> This constitution may be revised and amended *only* as therein provided.

Article XII, § 1 (emphasis added). Among other prerequisites found in the constitution, the initiative petition must (1) be signed by 8% of the voters in each of two-thirds of the congressional districts in the state, (2) be filed with the Secretary of State no less than four months before an election, (3) contain a proper enacting clause, and (4) contain no more than one amended and revised constitutional article, or one new article which contains not more

than one subject and matters properly connected therewith. *Mo.Const. art. III, § 50.* The constitution has created two competing and contradictory concepts: the inherent right of the people to alter the constitution, and the need for stable, permanent, organic law. *Buchanan v. Kirkpatrick,* 615 S.W.2d 6, 11 (Mo. banc 1981). Neither concept may be ignored to advance the other, but the two must be balanced.

Courts are understandably reluctant to become involved in pre-election debates over initiative proposals. Courts do not sit in judgment on the wisdom or folly of proposals. Neither will courts give advisory opinions as to whether a particular proposal would, *if adopted,* violate some superseding fundamental law, such as the United States Constitution. *State ex rel. Dahl v. Lange,* 661 S.W.2d 7, 8 (Mo. banc 1983); *State ex rel. Cramer v. Brown,* 7 Ohio St.3d 5, 454 N.E.2d 1321, 1322 (1983). Our single function is to ask whether the constitutional requirements and limits of power, as expressed in the provisions relating to the procedure and form of initiative petitions, have been regarded. *Edwards v. Lesueur,* 132 Mo. 410, 33 S.W. 1130, 1133 (banc 1896).

## III.

The pivotal question here is whether this proposed constitutional amendment violates the requirement that an initiative petition contain no more than one subject and matters connected therewith.

■ Appellants argue that the trial court had no jurisdiction prior to the election to reach the merits of the claim that the initiative petition contains more than one subject. There is authority suggesting, but not holding, that substantive defects in initiative proposals may only be raised after the election, and that a claim of multiple subjects is substantive. *State v. Burns,* 351 Mo. 163, 172 S.W.2d 259, 266 (1943); *Moore v. Brown,* 350 Mo. 256, 165 S.W.2d 657, 662 (banc 1942). The rule alluded to in those cases was not based on any language in the constitution or statutes relative to initiative petitions. The principle arises out of general policies relating to judicial re-

straint and economy of judicial resources. Appellants rely on various statements in the cases saying that courts will not render an advisory opinion as to whether a proposal would be constitutional if adopted, *Union Elec. Co. v. Kirkpatrick*, 678 S.W.2d 402, 405 (Mo. banc 1984), or that the initiative process, being akin to the legislative process, should not be interrupted until the legislative labor is complete, *Pitman v. Drabelle*, 267 Mo. 78, 183 S.W. 1055, 1057 (banc 1916). Neither of those cases nor others cited by appellants hold that the courts of this state lack authority to conduct a pre-election examination of an initiative petition to determine whether it complies with the provisions of article III, § 50.

There are equally compelling reasons to grant pre-election review. The cost and energy expended relating to elections, and the public confusion generated by avoiding a speedy resolution of a question militate in favor of a limited pre-election review. There are also several cases in which courts have conducted a pre-election review to determine if conditions precedent to placing a proposal on the ballot have been met. *See Moore v. Brown*, 350 Mo. 256, 165 S.W.2d 657 (banc 1942); *State ex rel. Stokes v. Roach*, 190 S.W. 277 (Mo. banc 1916); *Yes to Stop Callaway Committee v. Kirkpatrick*, 685 S.W.2d 209 (Mo.App. 1984). In *Moore*, this Court actually struck an issue from the ballot because of defects similar to those asserted here. In *Buchanan*, 615 S.W.2d at 12–13, the Court said:

> Mo.Const. art. III provides the safeguard against petitions containing *"more than one subject and matters properly connected therewith."* (Emphasis added.) Section 126.081 [RSMo 1978, now repealed] … authorizes anyone "dissatisfied" with the [ballot] title to resort to the courts. Either of these matters is reviewable by the courts prior to election.

The claim that no initiative proposition has been or can be struck from the ballot prior to election because it submits issues in a manner prohibited by the constitution is unsupported by the cases.

■ Ultimately, the rationales for granting or refusing pre-election judicial review must give way to the plain language and reasonable construction of the constitution and statutory provisions relating to the initiative process. The dichotomy between procedural defects in the initiative process and substantive defects in that process is not found in the language of the constitution or the statutes. Among other prerequisites, article III, § 50 provides, "Petitions for constitutional amendments shall not contain more than one amended and revised article of this constitution, or one new article which shall not contain more than one subject and matters properly connected therewith." Any reasonable construction of the quoted language leads to the inescapable conclusion that regardless of the meritorious substance of a proposition, if the prerequisites of article III, § 50 are not met, the proposal is not to be on the ballot. Any controversy as to whether the prerequisites of article III, § 50 have been met is ripe for judicial determination when the Secretary of State makes a decision to submit, or refuse to submit, an initiative issue to the voters. At that point, a judicial opinion as to whether the constitutional requirements have been met is no longer hypothetical or advisory.

■ Appellants contend that *Payne v. Kirkpatrick*, 685 S.W.2d 891 (Mo.App. 1984), prohibits the Secretary of State from considering matters other than the sufficiency of the signatures. That case does not so state, nor is the claim consistent with a reasonable reading of § 116.120. Under that statute, the Secretary of State is charged with determining whether the petition "complies with the Constitution of Missouri and with this Chapter." § 116.120.1. If the legislature had only intended that the Secretary of State count signatures, it could have so stated. But the language used mandates a more extensive examination. At minimum, § 116.120.1 requires the Secretary of State to examine the petition to insure that the threshold requirements of article III, § 50 have been met. That necessarily requires the Secretary of State to examine the proposal to insure it does not contain multiple subjects.

The statutes provide that after a determination of the petition's sufficiency, the Sec-

retary of State is to issue a certificate that the petition contains sufficient signatures to comply with constitutional requirements. § 116.150.1. After the petition is certified, "any citizen may apply to the circuit court of Cole County to compel [the Secretary of State] to reverse his decision." § 116.200. As previously noted, an essential element of the Secretary's decision is the determination that the petition complies with the constitutional requirements found in article III, § 50. Thus, the trial court committed no error and had the authority under § 116.200.1 to consider, prior to the election, whether the petition complied with the requirements found in article III, § 50.

## IV.

■ Ancillary to other arguments, appellants present a complex argument that the plaintiffs' remedy is untimely because the pre-election remedy relating to dual subject matter is limited to a proceeding to test the sufficiency of the ballot title under § 116.190. That provision authorizes an action to challenge the ballot title, although it does not authorize an injunction to stop the election. If the ballot title challenge is timely filed, the court is authorized to do no more than certify a correct ballot title. Section 116.190 does not authorize a review as to whether the constitutional prerequisites have been met. The legislature has provided another remedy, and that remedy is found under § 116.200. As previously noted, that section permits the trial court to proceed to determine whether the initiative petition here at issue violated the single subject rule. An action to challenge the Secretary's decision must be brought within ten days after certification. § 116.200.1. In this case, the Secretary of State issued his certificate on September 1, 1990, and plaintiffs filed a petition for injunction September 5, 1990. The petition for the injunction was filed within the ten-day time limit. The claim that the action is untimely is without merit.

## V.

■ Appellants further argue that plaintiffs lack standing. The statute authorizing injunctive relief permits "any citizen" to bring the action. § 116.200.1. Plaintiffs are not required to show any particular harm. Defendant's answer admits plaintiffs are Missouri citizens. The claim that the individual plaintiffs lack standing is without merit.

## VI.

■ An additional basis for claiming trial error is the assertion that the placement of the comma in article III, § 50, and article XII, § 2(b) of the 1945 Constitution modified the meaning of the language of those sections. Article XV, § 2 of the constitutional provision predating 1945 provided, "No proposed amendment shall contain more than one amended and revised article of this Constitution or one new article which shall not contain more than one subject and matters properly connected therewith." In 1945, the same language became part of article III, § 50 and article XII, § 2(b), but a comma was added between the word "Constitution" and the word "or." Appellants would have us apply for the first time a strict grammatical rule [3] so that the phrase "shall contain no more than one subject" does not apply to revisions or amendments of a pre-existing article, but only to proposals seeking to add a new article to the constitution. If appellants' punctuation argument were accepted, a proposed amendment could, so long as it is denominated as an amendment to a single article, repeal the entire document and enact a new constitution.

What appellants' argument does not take into account is that the cases decided both before and after 1945 have consistently treated the "shall not contain more than one subject" phrase as applicable to revised or amended constitutional articles and has not limited that phrase to new constitution-

---

**3.** "[W]hen a conjunction connects two coordinate clauses or phrases, a comma should precede the conjunction if it is intended to prevent following qualifying phrases from modifying the clause which precedes the conjunction." *Application of Graham,* 239 Mo.App. 1036, 199 S.W.2d 68, 74 (1946).

al articles. *See, e.g., Buchanan v. Kirkpatrick,* 615 S.W.2d 6 (Mo. banc 1981); *Moore v. Brown,* 350 Mo. 256, 165 S.W.2d 657 (banc 1942).

In addition, the constitution is organized *by subject* into various articles. Each article is subdivided into sections. The sections relate to specific matters *connected with* the general heading of the article. The concept of "one amended or revised article" carries with it the connotation of a single subject and connected matters. To say an amendment must be limited to "one amended and revised article . . . which shall not contain more than one subject and matters properly connected therewith," is somewhat redundant.

 More importantly, courts are directed by something more than strict grammatical rules when construing the constitution. Courts are reluctant to determine matters of deep concern solely upon consideration of punctuation and grammar if the purpose of the provision may be otherwise determined. *Application of Graham,* 199 S.W.2d at 75. In this situation, the purpose of the prohibition on multiple subjects in a single ballot proposal is to prevent "logrolling," a practice familiar to legislative bodies whereby unrelated subjects that individually might not muster enough support to pass are combined to generate the necessary support. *Moore v. Brown,* 165 S.W.2d at 662. The prohibition is intended to discourage placing voters in the position of having to vote for some matter which they do not support in order to enact that which they earnestly support. The single subject matter rule is the constitutional

assurance that within the range of a subject and related matters a measure must pass or fail on its own merits. *State ex rel. Callaghan v. Maitland,* 296 Mo. 338, 246 S.W. 267, 272 (banc 1922). That purpose is restated in article XII, § 2(b), the relevant portion of which reads:

> More than one amendment at the same election shall be so submitted as to enable the electors to vote on each amendment separately.

The records of the constitutional debates also support the conclusion that the drafters had no intent to modify the historical meaning of the article.[4] In the absence of something to suggest that the 1945 addition of the comma was intended to modify the purpose, this Court continues to give the prohibition its historical meaning.

## VII.

 As previously noted, the dispositive question is whether the initiative proposal contains more than one subject and matters related thereto. In determining whether the proposed constitutional amendment violates the "one subject" rule, there are certain general principles that have been established. A proposal will be liberally and nonrestrictively construed so that provisions connected with or incident to effectuating the central purpose of the proposal will not be treated as separate subjects. *See Buchanan v. Kirkpatrick,* 615 S.W.2d 6 (Mo. banc 1981); *Oregon Educ. Ass'n v. Phillips,* 302 Or. 87, 727 P.2d 602 (1986). An amendment to any article may have the effect of changing

---

**4.** Volume 3, *Debates of the Missouri Constitution 1945* (March 14, 1944), contains the only discussion of the provision:

> The Constitution also contains the usual restrictions that the amendments must be submitted so that the people may express their views upon one proposition rather than upon many propositions. It is general that the amendment must contain not more than one amended or revised Article of the Constitution and be so stated on the ballot that the choice may be made independently of the other propositions.
>
> . . . .
>
> Now, Section 2 is the same as Section 2 of the present Article, with the exception that it amplifies the article by directing attention to the fact that the requirement of a separate state-

ment shall apply to the initiative. Also, it contains the change, which I believe is justly mentioned, that there are to be publications in two newspapers for two consecutive weeks. Otherwise, it is the substance of the present Section 2 of the Constitution, provided that the General Assembly may have proposed amendments, providing also that if they are proposed by Initiative that it shall contain not more than one amendment to the revised article. It is the same substance as the present Constitution and that again has been the part of the Constitution ever since 1875. I should like to move that that section be adopted and call for amendments.

PP. 580, 583–84 (from the statement of Mr. Phillips of Jackson).

several articles or sections of the constitution, *if all are germane to a single controlling purpose.* *Moore v. Brown,* 165 S.W.2d at 662. Ultimately each proposal to amend the constitution must turn on the particular language and the subject matter involved.

The *Buchanan* case, more than any other, probed the outer limits of what matters may be included in a single constitutional proposition without violating the single subject rule. The proposition there under consideration amended article X, relating to taxation. Arguably, the proposal included six subjects: 1) a taxation lid on state government; 2) a spending lid on state government; 3) a directive that state government continue financial support of local government; 4) a tax lid on local government; 5) limits on local governments obtaining revenues based on assessments and property; and 6) a grant of original jurisdiction to the Supreme Court to hear taxpayer suits to enforce the provisions of the amendment. The proposal contained matters that had the effect of limiting the authority of the legislature and granted jurisdiction to the judiciary, subjects previously found in article III and article V, respectively. Nevertheless, the Court found a readily identifiable and reasonably narrow purpose that knitted all the diverse provisions together. The central purpose was to limit taxes and spending by state and local government. *Buchanan v. Kirkpatrick,* 615 S.W.2d at 13.

In the case now before the Court, the portions of the proposal revising §§ 2 through 25 of article III focus exclusively on the regulation of the General Assembly. Among other things, the revised sections would reduce the number of the members of the General Assembly beginning in the year 2003, modify the length of the legislative session and establish regulations relating to committee appointments. The new provisions of the proposal, beginning with § 54, create an ethics commission having authority to 1) regulate those who lobby legislators or *members of the executive branch,* 2) require legislators, *members of the executive branch* and other state officials and employees to file financial disclosures, and 3) enforce specified ethical restrictions against legislators and *members*

*of the executive branch.* Finally, the new provisions authorize imposition of sanctions against members of the General Assembly, *members of the executive branch,* and other public officials for ethical conduct violations. From this description of the proposal, it is apparent that the amendment would substantially reorganize the legislature and, at the same time, impose constitutional ethical restrictions on officers, officials, and employees of the legislative and executive departments.

■ The constitution is divided into separate articles. The legislative department is provided for in article III. The executive department, its officers, and their responsibilities are provided for under article IV of the constitution. Public officials, in general, regulation of their conduct, and sanctions against their misconduct have heretofore been the subject of article VII. The organization of the constitution creates a presumption that matters pertaining to separate subjects therein described should be set forth in the article applicable to that subject and not commingled under unrelated headings. The organizational headings of the constitution are strong evidence of what those who drafted and adopted the constitution meant by "one subject."

■ The fact that a single initiative petition amending one article has the effect of amending more than one article of the constitution does not render the proposal *per se* in violation of the multiple subject prohibition; however, a proposal having such effect is suspect. When a proposal deals with matters that were previously the subject of an article other than the one being amended, the Court must scrutinize the proposal to see if all matters included relate to a readily identifiable and reasonably narrow central purpose.

The Court looks first to the explanation of the appellants to determine what single subject they assert is contained in the proposal. The appellants do not agree on the subject of the initiative petition. The brief of the "Yes for Ethics Committee" suggests the single subject of the proposal is that all sections are "legislative matters."

The Secretary of State's brief avers the single subject is "the regulation of public officials' conduct." As appellants would have us construe these subjects, they are extremely broad.

If multiple matters may be lumped together under excessively general headings, the single subject restriction of article III, § 50 would be rendered meaningless. Even though specific provisions of a proposal are given a liberal and non-restrictive construction in determining what matters are connected to a particular subject, the Court will not adopt a construction of the words "one subject" that renders the constitutional prohibition against multiple subjects meaningless. Furthermore, the subject "legislative matters" is not connected to the ethical restrictions on officials of the executive department. Similarly, the subject "regulation of public officials' conduct" is unconnected to the number of members in the General Assembly or the length of legislative sessions. Thus, even under the broad rubrics suggested, this proposal fails to comply with the constitutional prerequisite that the proposed amendment contain no more than one subject. The failure of the appellants to agree on the identification of a central purpose is a strong indicator of the proposal's multiplicity.

Notwithstanding the explanations of appellants, the Court must make an independent examination of the proposed amendment to determine if there is a discernable single subject to which all provisions of the proposal are connected. The proposed revisions of §§ 2 through 25 of article III are all related to the organization of the legislative department. The proposed new amendments, beginning with § 54 of article III, relate to establishment and enforcement of standards of conduct on a broad range of public officials, a subject heretofore found in article VII. That being true, it is necessary to find a readily identifiable and reasonably narrow single purpose to which 1) a general reorganization of the legislative department including the number of members and session length of the General Assembly, article III matters, and 2) the general regulation of the conduct of public officials, an article VII matter, are both related. These provisions are so diverse as to defy being connected to a single central purpose. Thus, the proposal fails to comply with the single subject requirement of article III, § 50.

## VIII.

Appellants suggest the provisions of the proposal may be severable as an alternative to invalidating the entire initiative. They cite two Missouri cases that have discussed severability of provisions of an amendment. In *State v. Thompson*, 323 Mo. 742, 19 S.W.2d 642 (banc 1929), this Court severed a paragraph that appropriated fees to the state road fund without legislative action from an amendment authorizing an additional bond issue for the construction of state highways. This Court found the amendment complete in itself and sufficient to accomplish its purpose without the appropriation provision.

The factors that make a provision severable are set out in footnote 8 of the *Buchanan* case. These include whether the provision is essential to the efficacy of the amendment, whether it is a provision without which the amendment would be incomplete and unworkable, and whether the provision is one without which the voters would not have adopted the amendment. *Buchanan v. Kirkpatrick*, 615 S.W.2d at 13, n. 8.

In the case at hand, the proposed amendment contains more than a single subject. It is impossible to say the signers intended only to support those provisions related to the internal operation of the legislature or to endorse only those provisions related to the general regulation of the conduct of public officials.

Since it is impossible to identify a single central purpose, it is necessarily impossible to identify those provisions that are essential to the efficacy of the amendment so that they may be segregated out. The severability argument is without merit.

The conclusion of the trial court that the initiative petition proposal contains more

than one subject is not erroneous. Accordingly, the judgment of the trial court is affirmed.

BLACKMAR, C.J., HIGGINS, COVINGTON, BILLINGS and HOLSTEIN, JJ., and MAUS, Special Judge, concur.

RENDLEN, J., dissents in separate opinion to follow. ROBERTSON, J., not sitting.

RENDLEN, Judge, dissenting.

For the reasons following, I respectfully dissent.

Missouri, among the many states with provisions for the initiative and referendum, affords its citizens the opportunity by direct vote to enact or repeal constitutional provisions. Here, as in a majority of states enjoying a system of popular legislation, constitutional amendments may reach the ballot without wending a course through the legislature. This populist system personifies the concept that the power to govern resides ultimately in the people; the citizen is sovereign. It is precisely described as a "power" reserved in the people, not a "right" granted them, *see Mo. Const. art. III, § 49*[1], one to be jealously guarded by the courts. Memorialized in the preamble to the United States Constitution by the phrase, "We, the people," this principle is eloquently enunciated in the opening provision of our Constitution, art. I, § 1:

> That all political power *is vested in* and derived *from the people;* that all government of right originates *from the people,* is founded upon their will only and is instituted solely for the good of the whole.

(Emphasis added). These sovereign people, the very source of government, are empowered by art. I, § 3, with:

> [*t*]*he inherent, sole and exclusive right* to regulate the internal government and police thereof and to *alter and abolish their Constitution and form of government whenever they deem it necessary,*

to their safety and happiness, *provided* such change *be not repugnant to the Constitution of the United States.*

(Emphasis added).

In *United Labor Committee of Mo. v. Kirkpatrick,* 572 S.W.2d 449, 454 (Mo. banc 1978), the Court stated that prior decisions "have discussed the importance of the initiative and referendum, emphasizing that procedures designed to effectuate these democratic concepts should be liberally construed to avail the voters with every opportunity to exercise these rights." The Court went further: "The ability of the voters to get before their fellow voters issues they deem significant should not be thwarted in preference for technical formalities," *id.* at 454, and concluded "the initiative process is too akin to our basic democratic ideals to have this process made unduly burdensome." The initiative power prescribed in the Constitution has been broadly construed and "is not laden with detail." *Id.* Statutes implementing the initiative are not allowed to "limit or restrict the rights conferred by the constitutional provision," *State ex rel. Elsas v. Missouri Workmen's Compensation Commission,* 318 Mo. 1004, 2 S.W.2d 796, 801 (Mo. banc 1928), and "[i]n a contest between the two, if the statute *restricts a right* conferred by the Constitution, the latter prevails ..." *State ex rel. Randolph County v. Walden,* 357 Mo. 167, 206 S.W.2d 979, 986 (Mo. banc 1947) (emphasis in original).

Typically, those arrayed against free exercise of the right of popular legislation are entrenched forces in the public or private sectors who sense their domains may be invaded or operations threatened by the initiative. In this connection, it has been aptly stated:

> A lawsuit to strike an initiative or referendum from a ballot is one of the deadliest weapons in the arsenal of the measure's political opponents. With increasing frequency, opponents of ballot proposals are finding the weapon irresistible and are suing to stop elections.

---

**1.** All constitutional references are to the Mo. Constitution of 1945 and amendments unless otherwise indicated.

*Pre-election Judicial Review of Initiatives and Referendums,* 64 Notre Dame Law Review 298 (1989). The author persuasively opines "it is generally improper for courts to adjudicate pre-election challenges to a measure's substantive validity," because:

> [s]uch pre-election review involves issuing an advisory opinion, violates ripeness requirements, undermines the policy of avoiding unnecessary constitutional questions, and constitutes unwarranted judicial interference with a legislative process.

*Id.* at 298.

The suit at bar is such a *pre-election* challenge designed to keep the proposal for amending Article III (the legislative article) from the ballot. The erroneous result reached by the trial court and affirmed by the majority constitutes unfortunate judicial interference with the popular legislative process and most certainly undermines the policy of avoiding unnecessary constitutional questions.

Plaintiffs, opponents of the initiative, brought suit in the Circuit Court of Cole County[2] pursuant to the provisions of § 116.200, RSMo 1986,[3] within ten days following the Secretary of State's certification under § 116.150.

The first step for an initiative occurs when proponents submit a sample petition containing the proposal "to the Secretary of State in the *form* in which it will be circulated." § 116.332.1 (emphasis added). The Secretary refers the sample "to the Attorney General for his approval," *id.,* and of importance here, those officers:

> must each review the petition for sufficiency as to *form* and approve or reject the *form* of the petition.

§ 116.332.1 (emphasis added). If approved by the Attorney General as to *form,* the Secretary makes "a final decision as to the approval ... of the *form* of the petition." Section 116.332.2 (emphasis added). In § 116.334, the requirement that the Attorney General shall examine the petition as to *form* is reiterated and, when so approved, the Secretary submits a proposed "petition title" of 100 words or less (this later serves as the "ballot title") to the Attorney General for approval as to legal content and form. The phrase "legal content" of this provision requires that the title concisely refer to and fairly state the items included in the general subject of the petition.

In the case at bar, the prescribed steps were followed and, after signatures were gathered, the petitions were presented to the Secretary of State for his examination to determine whether they complied with "the Constitution of Missouri and with this chapter." § 116.120. At this stage, he was required to verify signatures through a demanding process described in § 116.130 and strike those determined invalid under § 116.140.[4] Completing this process, the Secretary declared the results of his determination by issuing:

> a *certificate setting forth by congressional district the number of the valid voter signatures* and stating whether the petition contains a *sufficient number of valid signatures to comply with the Constitution of Missouri and with this chapter* (emphasis added). Section 116.-150.1.

His certificate could issue "only for a petition approved pursuant to § 116.332." *See § 116.150.2.*

---

**2.** The appeal from the circuit court, originally filed here, was transferred to the Court of Appeals, Western District, as the cause fell beyond the ambit of the Supreme Court's original appellate jurisdiction. Mo. Const., art. V, § 3. However, the court of appeals immediately requested under the provision of Article V, § 10, that this Court take the case on retransfer, which was done in the shortest possible time and the case was set and argument heard October 22, 1990.

**3.** All statutory references are to RSMo 1986 unless otherwise indicated.

**4.** A person submitting the petition may bring an action in the circuit court of Cole County to compel the Secretary of State to show cause why names were stricken. *See United Labor Committee of Mo. v. Kirkpatrick,* 572 S.W.2d 449 (Mo. banc 1978), where such a suit was brought under § 126.071, RSMo Supp.1975, the predecessor to current § 116.200.

The recurring theme is examination and approval of the *form* of the petition, coupled with a meticulous investigation of signatures to ensure that the number of voter signatures *required by the Constitution* from the minimum number of congressional districts *required by the Constitution* have been met. Quite simply, the reference to the "Constitution of Missouri" appearing in §§ 116.120 and 116.150 is necessary to direct the reader to the Constitution, which specifies the *number of signatures required* for a valid petition (eight percent of the legal voters in each of two-thirds of the congressional districts, art. III, § 50). These are the findings and conclusions *certified* under § 116.150 that may be challenged by suit brought within ten days in the Circuit Court of Cole County. This streamlined procedure requires that suits seeking reversal of the *certification* be "advanced" on the court's docket and "decided by the court as quickly as possible." § 116.200.1. This expeditious, pre-election proceeding is specially tailored for challenging *those matters* certified by the Secretary under § 116.150 and, in this instance, the number of valid signatures sufficient to satisfy the Constitution was not contested, hence, as to that issue, the Secretary's determination became final. However, straying afield, the trial court undertook to consider not those matters certified under § 116.150, but erroneously threw open the proceeding to include perceived substantive defects of the initiative that were neither determined nor certified by the Secretary of State. I submit such issues are beyond the scope of this statutory action.

By unduly broadening the language of §§ 116.120 and 116.150, the majority in its per curiam opinion maintains the Secretary of State is intended to do more than certify that there were a *sufficient number of valid signatures* from the required number of congressional districts. As the majority puts it, "if the legislature had only intended that the Secretary of State count signatures *it could have so stated* (emphasis supplied)." This misses the mark, for there is nothing in Chapter 116 indicating that under § 116.120 or § 116.150 the Sec-

retary shall certify other than the validity of and the numbers of the signatures by congressional districts. In this regard, I would suggest that if the legislature had intended that the Secretary of State under § 116.120 or § 116.150 certify *to more than* the number of valid signatures by congressional districts "*it could have so stated.*" Are we not bound to read the language of this unambiguous statute according to its plain words and from those words determine its meaning? *Wolff Shoe Co. v. Director of Revenue,* 762 S.W.2d 29 (Mo. banc 1988). Did not the legislature mean what it said in § 116.150 that the Secretary shall certify and state:

> whether the petition contains a sufficient number of valid signatures to comply with the Constitution and with this chapter?

Unfortunately, it appears the majority is determined to speculate on what the legislature *might have said* rather than what it *did say.* When the language is clear, we are not permitted the luxury of casting our spin to find what might have been intended. It should be noted the majority in its truncated discussion of § 116.120 is conspicuously silent as to the correlation of §§ 116.130, 116.140, 116.150, 116.332 and 116.334, which, when read *in toto,* reinforce the conclusion that reference in §§ 116.120 and 116.150 to the Constitution necessarily directs the reader to that document to learn the required number of signatures from the specified number of congressional districts, for it is in that document those requirements appear. The enumerated sections of Chapter 116 are *in pari materia;* accordingly, pre-election challenges to the Secretary of State's certification under this chapter should be confined to the summary proceeding delineated therein.

Because the circuit court erroneously extended the range of this special statutory proceeding, I submit the judgment should be reversed.

This, however, is not to say opponents of an initiative are limited only to proceedings under § 116.200. In *Buchanan v. Kirkpatrick,* 615 S.W.2d 6 (Mo. banc 1981), this

Court entertained an appeal from the Circuit Court of Cole County in which the trial court had refused to enjoin the Secretary of State from placing the proposed amendment No. 5 (Hancock Amendment—a broad and complicated amendment changing many parts and adding many new sections to Article X) on the November, 1980, election ballot. Two previous suits had been filed. The first stemmed from the Secretary of State's certification that the number of signatures was inadequate. The proponents immediately brought mandamus to require him to replace signatures he had stricken from the Sixth Congressional District petitions. This Court entertained an original proceeding in mandamus, and on September 19, 1980, in *Missouri Farm Bureau Federation v. Kirkpatrick*, 603 S.W.2d 947 (Mo. banc 1980), ordered replacement of the signatures. From this, we learn that resort to an extraordinary legal remedy filed originally in this Court is available to litigants in initiative proceedings.

Within the week, on September 24, a second suit was brought in this Court again seeking mandamus, this time by the opponents, *State ex rel. Buchanan v. Kirkpatrick* (# 62514), but in that instance the petition was denied by order "without prejudice to subsequent litigation of issues not mooted by the election." Implicit in that order was the suggestion that other actions might be utilized to raise other issues. Responding to that suggestion, the opponents on October 1 (more than a month before the election), filed still another action, *Buchanan*, 615 S.W.2d 6, this time seeking an injunction in the Circuit Court of Cole County to restrain the Secretary from placing the proposed amendment on the ballot. When denied eight days later, the cause came here on appeal October 17, and on October 20 appellants sought an expedited

hearing. Appellants' objections to the substantive content of the proposed amendment included the question of whether the amendment encompassed more than one subject, and in oral argument equal protection and due process challenges were raised. The Court, noting these substantive questions, refused to consider them *before* the election and the "Hancock Amendment" was submitted to and approved by the voters. The cause was held in abeyance until January 29, 1981, and on that day arguments were heard, followed by the Court's opinion April 3, 1981. This stands sharply in contrast against the process employed in the case *sub judice*, where not only procedural issues but substantive challenges were *considered* and *ruled* immediately before the election.

The precedent established by *Buchanan* for determining *substantive* issues in the period of relative calm following elections is without question the preferable course. While there is authority for pre-election consideration of substantive issues, *Moore v. Brown*, 350 Mo. 256, 165 S.W.2d 657 (banc 1942), decided long before the enactment of Chapter 116, experience demonstrates that addressing substantive challenges in post-election proceedings provides a more appropriate environment, one allowing room for deliberation, which avoids the time-pressured constraints of the final days before election.[5] If we had but followed the precedent of *Buchanan*, 615 S.W.2d 6, the Court in a less harried, post-election setting could more deliberately have explored the substantive issues I now address.

The majority identifies the dispositive question as "whether the initiative proposal contains more than one subject and matters related thereto" and references Article III, § 50 and Article XII, § 2(b).[6] Though the

---

5. Festinatio justitiae est noverca infortunii.

6. The Constitution, Article III, § 50 (see also Article XII, § 2(b)) provides initiative:

 petitions for constitutional amendments shall not contain more than *one amended* and *revised* article of this Constitution, *or* one *new* article which shall not contain more than one

subject and matters properly connected therewith (emphasis added).

The comma has been recently added before the disjunctive *or* and the clauses separated by the disjunctive are discrete. However, the majority has construed the provision to conform to its interpretation of the meaning and, in effect, would add thirteen words which are shown

qualifying language "shall not contain more than one subject and matters properly connected therewith" of those sections is grammatically connected to its antecedent phrase "one new article" and modifies only its antecedent, and though the earlier phrase "one amended and revised article" is separated by both the comma and the disjunctive "or" and is not so modified or limited; nevertheless, for the purpose here I assume arguendo the limitation is intended to apply to this proposal for amendment of an *existing* article.

In *Buchanan, supra,* the Court searched for a central theme that could justify approving the Hancock Amendment under the "one subject" requirement of Article III, § 50. In its search, the Court found what it considered a thread running through the many-faceted initiative proposal. It declared the "central purpose" was "to limit taxes" but conceded the amendment contained an additional subject, i.e., "to limit spending." *Taxing* is manifestly different from *spending,* but the common purpose proclaimed by the Court was putting a "lid" on each. This lid applied to taxing and spending practices of state government and for local governments. Assigning this as the central purpose, the Court justified the separate subjects in the proposal as necessary "to accomplish the central purpose," *id.* at 13, and described them as subjects properly "connected with the central or primary purpose of the amendment to control taxes and expenditures." *Id.* at 14.

Hancock arguably contained more than six subjects: (1) *Taxation* lid (§§ 16, 17 and 18) on state government; (2) *Spending* lid (§§ 18, 19 and 20) on state government; (3) Controls on the manner in which funds may be spent by state government; (4) Prohibitions against shifting the burden of government cost to the counties or other political subdivisions; (5) Taxation lid (§ 22) on local government; (6) Limitation on local governments (§ 22) in obtaining revenues based upon assessments and property; and (7) a novel grant of original jurisdiction to the Supreme Court, amending Article V, §§ 3 and 4 of the Missouri Constitution. Mingled among those subjects was a bizarre method for repayment of *all* revenues collected in excess of the constitutionally established limit to a *select group* of taxpayers.

I submit that the instant proposal for amending Article III contains a central purpose as readily discernible as that of the Hancock Amendment to Article X. Inasmuch as the Court in *Buchanan* found a central purpose for Hancock, assuredly such purpose can be found in this proposal. Judicial responsibility requires that the central purpose be identified, if reasonably possible, and then be properly and fairly articulated. It is in the light of such articulation that the Court determines if the parts are "properly connected" with that purpose.

This initiative is limited to the amendment of a single constitutional article. The opening words of the ballot title are, "Shall Article III of the Constitution of Missouri be amended....", i.e., the article establishing the "Legislative Department." The central theme of the proposal is modification and regulation of the legislative function. Article III designs the framework, size and composition of the Legislative Department. Its broad provisions encompass legislative proceedings, limitations on legislative power, standards of conduct for legislators, initiative and referendum, and a myriad of items related to the legislative function. An amendment of *all* or *any part* of Article III crafted to modify and

---

parenthetically and emphasized in the following version of § 50:
> Petitions for constitutional amendments shall not contain more than one amended and revised article of this Constitution (WHICH SHALL NOT CONTAIN MORE THAN ONE SUBJECT AND MATTERS PROPERLY CONNECTED THEREWITH), or one new article which shall not contain more than one subject and matters properly connected therewith.

If § 50 were as the majority contends, it could have been drafted in this form:
> Petitions for constitutional amendments shall not contain more than one amended and revised article of this Constitution, or one new article *and neither* shall contain more than one subject and matters properly connected therewith.

regulate the legislative function is an appropriate subject for an initiative. Each of the amended sections, as well as the new provisions, are intimately tied to the modification and regulation of the legislative function by restricting the legislature, its activities and manner of operation. Whether the proposal would improve the legislative function should be a judgment left to the voters.

Referring to the proposed amendment by its section numbers, Section 2 reduces the size of the legislature and provides the machinery for so doing. Section 9 relates to the part played by the legislative process in declarations of candidacy for public office. The legislature is limited in its authority for setting dates for such filings, which necessarily impact filings by candidates for the House or Senate as well as for other state officials. It cannot seriously be suggested that such limitation on legislative authority should be in other than Article III, or that it is not properly connected with the initiative's central purpose. The same must be said of the following: Section 16 relating to legislators' compensation, and the process for audit of legislative salaries and per diem; Sections 20 and 20(a) relating to the time for commencement and adjournment of legislative sessions, plus deadlines for bills within the legislative time table; Section 21 relating to the style of bills and similar matters; Section 22 which has to do with the internal method of referring bills by committee, membership of committees and conduct of business within the Houses; Section 23 containing the "one subject" requirement for bills plus related requirements concerning the appropriation process; and Section 25 placing time limits for introduction of bills and special provisions regarding appropriation bills. Section 54 relates to the conduct of those involved in the legislative process, a matter intimately connected with modification and regulation of the legislative function. This section not only regulates such conduct, but establishes an ethics commission to monitor this activity. Among other duties, the commission has rule-making power and authority to recommend legislation to the General Assembly, including recommendations for a code of ethics, promulgation of rules regulating lobbyists and the power to suspend violators. Under Section 54.5(5), the commission is empowered to require members of the General Assembly and other state officials to make financial disclosures. To carry out its functions, the commission is authorized to investigate and seek civil enforcement of its rules and report evidence of certain criminal activity.

Section 55 adds special ethical restrictions applicable to legislators and other state officials, pertaining to conflict of interest and improper financial dealings.

These matters are not merely "properly connected," but are crucial to and vitally connected with the central purpose of the initiative proposal. However, the majority concludes that because several of the constraints placed on legislators are also applicable to "members of the executive branch" or other public officials and lobbyists, the proposal must fail. I submit that regulation of legislators and others outside the legislative department is proper because such regulation is tied to their connection with the legislative function. Not only legislators but other public officials and lobbyists are closely involved and vitally affect that function; all so involved should be subject to control and accountable for their actions. The majority also suggests references to the "members of the executive branch" should be only included in a proposal for an amendment of Article IV and sanctions against misconduct of "public officials" limited to amendments of Article VII. It concludes, "the organization of the Constitution creates a presumption that matters pertaining to separate subjects therein described should be set forth in the article applicable to that subject and not commingled under unrelated headings." Maj. Opinion 831. The majority apparently has overlooked the fact that provisions regulating activities of the "executive branch" are found in Article III when those activities are intimately involved with the legislative function, e.g., Article III, § 12, which prohibits any person holding any lucrative office (members

of the executive branch) or employment by the state (governmental employees in the executive or judicial branches) from becoming a legislator. Similarly, Article III, § 31, prescribes certain duties of the Governor when those duties are connected with the legislative process. However, if the scattered references in this proposal pointing to "members of the executive branch," state officials other than legislators and to lobbyists are beyond the central purpose and not matters properly connected therewith, such scattered references are readily severable.

In *Buchanan,* 615 S.W.2d 6, the Hancock Amendment, adding tax and spending lids to state and local governments in Article X, contained a novel grant of original jurisdiction to the Supreme Court, thus amending Article V, §§ 3 and 4. Confronted with that offending thorn protruding from the side of Hancock, the Court concluded the unacceptable provision was severable, stating:

> The provision purporting to place jurisdiction of such suits in this Court is not essential to the efficacy of the amendment. If eliminated, the remainder is still complete in itself and sufficient to accomplish the purpose for which it was adopted. It is not a provision without which the voters would not have adopted the amendment and without which the amendment would be incomplete and unworkable. (Citations omitted.) In short, the provision, which is ineffectual with respect to suits being filed in this Court for the reasons earlier stated is severable.

> *See State ex rel. State Highway Commission v. Thompson,* 323 Mo. 742, 751; 19 S.W.2d 642, 645 (banc 1929).

*Id.* at 13 n. 8.

Here, shorn of the references to "executive branch and officials other than legislators," the proposal is complete and workable; the structure remains intact. The "severability" doctrine invoked in *Buchanan* regarding constitutional proposals can be found codified in § 1.140, RSMo 1986, as to statutory enactments. It provides:

> If any provision of a statute is found by a court of competent jurisdiction to be unconstitutional, the remaining provisions of the statute are valid unless the court finds the valid provisions of the statute are so essentially and inseparably connected with, and so dependent upon the void provision that it cannot be presumed that the legislature would have enacted the valid provision without the void one, or unless the court finds that the valid provisions, standing alone, are incomplete and are incapable of being executed in accordance with the legislative intent.

This Court has declared in *Boone County v. State of Missouri,* 631 S.W.2d 321, 324 (Mo. banc 1982), that rules applicable to constitutional construction are essentially the same as those applied to statutory construction except that the former are to be given a broader construction. Hence, this proposal for a constitutional amendment should receive at least the same genial treatment as that afforded legislative enactments. If the people had been afforded the opportunity of voting on the proposal and it had been adopted, it would have been entitled to the same consideration as the proposals considered in *Buchanan* and *Boone County.*

A separate subsection, 56.1, provides for the automatic appropriation of at least $240,000 to fund the ethics commission's operations. This subsection stands athwart § 51, Article III, which provides, "the initiative shall not be used for the appropriation of money other than new revenues created and provided thereby ..." Though the purpose of this is obvious, regardless of how salutary or obvious the purpose, this is a matter beyond the permitted range of § 51, Article III, and should be severed. Such severance could not conceivably affect the proposal's efficacy.

I would reverse the judgment of the trial court and would have permitted submission of the proposal to a vote of the people.