COMMITTEE FOR A HEALTHY FU-
TURE, INC., et al., Respon-
dents/Cross–Appellants,

v.

Robin CARNAHAN, Missouri Secretary
of State, et al., Respondents,

Louis Smither, et al., Appellants/Cross–
Respondents.

No. SC 88018.

Supreme Court of Missouri,
En Banc.

Oct. 11, 2006.

505

Marc H. Ellinger, James B. Deutsch, Jane A. Smith, Jefferson City, Timothy Belz, St. Louis, for Appellants/Cross–Respondents.

Jeremiah (W) Jay Nixon, Atty. Gen., Daniel Y. Hall, Joel E. Anderson, Emily P. Kalmer, Asst. Attys. Gen., for Respondents.

Robert L. Hess, II, Harvey M. Tettlebaum, Charles W. Hatfield, Jefferson City, for Respondents/Cross–Appellants.

Thomas W. McCarthy, James R. Walsh, McCarthy, Leanard, Kaemmerer, Owen, McGovern, Striler & Menghini, L.C., Chesterfield, for Amicus Curiae Representative Carl Bearden, Speaker Pro Tem of the Missouri House of Representatives, Representative Alan Icet, Budget Chair of the Missouri house of Representatives and Senator Charles Gross, Appropriations Chair of the Missouri Senate in Support of the Appeal of Appellants/Cross–Respondents Louis Smither, et al.

PER CURIAM.

■ Louis Smither, Missourians Against Tax Abuse, and others (Intervenors) appeal the circuit court's judgment ordering the Secretary of State to certify the sufficiency of the tobacco tax initiative petition for placement on the November 7, 2006, general election ballot. The judgment of the circuit court is affirmed.[1]

1. Various constitutional issues raised on cross-appeal are not addressed as it is not necessary to reach them. Decisions regarding constitutional questions will be avoided if the case can be fully determined without reaching them. *Kenney v. Wal–Mart Stores,*

## I. Facts

The Committee for a Healthy Future, Inc. (Committee) collected signatures on an initiative petition proposing that the Missouri Constitution be amended to increase the tax on tobacco products and to provide for the disbursement of those revenues. In order for the proposal to be placed on the November 2006 general election ballot, the Committee needed to collect the signatures of eight percent of the legal voters from two-thirds (six of nine) of the congressional districts. Mo. Const. art. III, sec. 50.

The Committee filed the initiative petition with the Secretary of State believing that it contained more than the required number of signatures. The Secretary of State sent copies of the petition to local election authorities (LEAs) to verify that the persons whose names were listed as signers to the petition were registered voters. Section 116.130.1, RSMo Supp.2005. She requested that the LEAs verify each signature rather than verify the signatures by random sampling.

The number of signatures exceeded eight percent of the legal voters in five of the six congressional districts submitted. In one of the congressional districts, the fifth—composed of parts of Cass and Jackson counties, the Secretary of State determined that the petition lacked the requisite number of signatures (23,527). Although LEAs in the fifth congressional district had certified 25,133 signatures, or 1,606 more than the constitutional requirement, the Secretary of State deducted 1,880 signatures that appeared on pages circulated by persons who the secretary determined had not properly registered with her office pursuant to section 116.080, RSMo 2000. After deducting those signatures, the fifth congressional district was

274 signatures short of the requisite number. Accordingly, the Secretary of State issued a certificate of insufficiency for the initiative petition pursuant to section 116.150, RSMo 2000.

The Committee timely challenged the Secretary of State's determination of insufficiency in the Circuit Court of Cole County. Section 116.200, RSMo 2000. The court allowed Intervenors to intervene in the action.

After the Secretary of State's determination of the petition's insufficiency and before trial, the Kansas City Board of Election Commissioners reexamined approximately one-third of the petition pages from Jackson County. At trial, a board employee produced documents identifying 263 valid signatures of legal voters from the fifth congressional district that were not included in the board's original certified count. In addition, the Committee reexamined all of the petition pages from Jackson and Cass Counties and presented evidence of 1,058 signatures of legal voters from the fifth congressional district that were not counted by the LEAs. Of those 1,058 signatures, the Intervenors agreed that at least 1,004 matched the signatures on file with the LEA, but Intervenors nonetheless argued that those 1,004 signatures should not be counted for various reasons, many of which are set forth below. The circuit court rejected those objections and held that the 1,004 additional signatures should have been counted. With the addition of those signatures, the petition bore the signatures of more than the 23,527 legal voters from the fifth congressional district as required by the constitution. Accordingly, the court found the tobacco tax initiative petition sufficient and ordered the Secretary of State to place the proposed amendment on the November

*Inc.,* 100 S.W.3d 809, 814, n. 2 (Mo. banc 2003).

2006 ballot. This expedited appeal follows. This Court has jurisdiction because the case involves the validity of a state statute. Mo. Const. art. V. sec. 3.[2]

## II. Standard of Review

 *Missourians to Protect the Initiative Process v. Blunt,* 799 S.W.2d 824, 827 (Mo. banc 1990), provides the standard of review.

Before reaching the issues presented in this appeal, it is important to make some general observations regarding the initiative process provided by the constitution. Nothing in our constitution so closely models participatory democracy in its pure form. Through the initiative process, those who have no access to or influence with elected representatives may take their cause directly to the people. The people, from whom all constitutional authority is derived, have reserved the "power to propose and enact or reject laws and amendments to the Constitution." Mo. Const. art. III, [sec.] 49. When courts are called upon to intervene in the initiative process, they must act with restraint, trepidation and a healthy suspicion of the partisan who would use the judiciary to prevent the initiative process from taking its course. Constitutional and statutory provisions relative to initiative are liberally construed to make effective the people's reservation of that power. . . . .

The people, speaking with equal vigor through the same constitution, have placed limitations on the initiative power. That those limitations are mandatory is clear and explicit.

This constitution may be revised and amended *only* as therein provided.

*Missourians to Protect the Initiative Process,* 799 S.W.2d at 827.

## III. Analysis

### A.

 Intervenors first argue that it was error to count the signatures of persons registered to vote at a different address than the one they listed on the initiative petition. They contend that the signatures of these voters registered at a different address (RDAs) are not signatures of "legal voters," which article III, section 50 of the Missouri Constitution requires for initiative petitions.

Intervenors urge this Court to follow *Yes to Stop Callaway Committee v. Kirkpatrick,* 685 S.W.2d 209 (Mo.App.1984), which they argue stands for the proposition that the signatures of RDAs cannot be counted. Crucial to the court's analysis in *Yes to Stop Callaway* was the fact that Missouri law at that time required voters who changed residence within the same LEA to transfer their registration on or before 5 p.m. on the fourth Wednesday prior to the election to be entitled to vote in that election. Section 115.165.4, RSMo Supp.1983. Because the RDAs in *Yes to Stop Callaway* had moved, the court of appeals held that they were not entitled to vote on the amendment proposed by the initiative petition at the time they signed it, and thus, their signatures should not be counted. 685 S.W.2d at 211.

Since *Yes to Stop Callaway,* federal and state law on voter registration has changed. In 1993, Congress passed the National Voter Registration Act (NVRA), Pub.L. No. 103–31, 107 Stat. 77 (codified as amended at 42 U.S.C. sec.1973gg to 1973gg–10 (Supp. II 2002)). The NVRA provides that a state shall not remove the

---

**2.** This Court retains jurisdiction even if the constitutional issues are not reached as in this case. *Farm Bureau Town and Country Ins. Co. of Missouri v. Angoff,* 909 S.W.2d 348, 350 (Mo. banc 1995).

name of a voter registrant from the registry in federal elections on the ground that the voter has changed residence within an LEA. 42 U.S.C. sec.1973gg–6(d)(1). The NVRA further provides that a voter who has moved to another address within the same LEA shall be permitted to vote if the voter notifies the election authority on or before election day. 42 U.S.C. sec.1973gg–6(e).

The Missouri General Assembly subsequently amended state voter registration statutes to comply with the NVRA and to make it apply to all elections. Under current Missouri law, a voter may file a change of address as late as election day and be entitled to vote in that election. Section 115.165.2, RSMo Supp.2005. By contrast, when *Yes to Stop Callaway* was decided, a similarly situated voter who waited until election day to transfer his or her registration would not be entitled to vote. The holding in *Yes to Stop Callaway* is no longer good law.

Intervenors' focus on address discrepancies in the analysis of who is a "legal voter" is misplaced. In *United Labor Committee of Missouri v. Kirkpatrick*, 572 S.W.2d 449, 455 (Mo. banc 1978), this Court held that article III, section 50 of the Missouri Constitution makes clear that the determining factor in analyzing whether initiative petitions are sufficient is whether they contain the signatures of eight percent of the legal voters in each of two-thirds of the congressional districts in the state. As such, the focus of this analysis is on the validity of the signatures.

Under section 116.130.1, RSMo Supp. 2005, a signature is valid only if the petition signer is a registered voter in the county named in the petition circulator's affidavit. The issue is not, as Intervenors argue, whether the petition signer is regis-

tered at a different address. The issue is whether the signer is registered to vote in that county, and, therefore, able to vote on the amendment proposed by the petition he or she signed.

The RDAs who signed the tobacco tax petition are registered to vote; they are merely registered, within the same LEA, at a different address from the one they listed on the petition. Despite having moved, they continue to be registered to vote and are not required to re-register at their new address. Rather, they may file a change of address as late as the day of the election to be permitted to vote in that election. Section 115.165.2, RSMo Supp. 2005. The RDA signatures were properly counted.

Intervenors also argue that petition signatures matching voter signatures on file with the LEAs should not have been counted when the address listed on the petition matched the electronic Missouri Voter Registration System, the official registry for the state,[3] but did not match the paper registration filed with the LEA. These petition signers belong to a subset of RDAs, therefore, their signatures were properly counted.

**B.**

■ Intervenors allege that it was error to count petition signatures with no congressional district numbers designated.

Among the information that section 116.040, RSMo 2000, requires to be on each page of an initiative petition is the signed name of the registered voter and the congressional district number in which he or she resides. Failure to give the voter's correct congressional district number is not of itself grounds for not counting a voter's signature. Section 116.130.3, RSMo Supp.2005.

---

3. Section 115.158.1(6), RSMo Supp.2005.

Intervenors' argument that the omission of the congressional district number is different from the failure to give the correct congressional district number is without merit. Whether the voter provides an incorrect congressional district number or fails to provide any congressional district number is a distinction without a difference. In either event, the voter has failed to give a correct congressional district number, and such failure is not fatal to the signature being counted pursuant to section 116.130.3. That statute further states that the election authority or the Secretary of State shall correct the congressional district number on the petition page. Such corrections were made for those voters with no congressional district number provided, and those voters' signatures were properly counted.

### C.

■ Intervenors next argue that certain petition signers improperly completed the petition form by writing an incorrect date, illegibly printing their names and addresses, or printing or signing their names in both blanks. Intervenors argue that signatures with these alleged irregularities should not be counted.

Section 116.040, RSMo 2000, sets out the form for each page of the initiative petition. The form is generally an attestation that the voter is registered, has personally signed the petition, and has provided the correct address. A circulator's affidavit and a notary's jurat follow. If this form is substantially complied with it is, "sufficient, and clerical and merely technical errors are to be disregarded." *Id.*

■ The paramount concern in construing statutes governing initiative petitions is determining whether or not the statute makes a specified irregularity fatal. "If not, courts will not be astute to make it fatal by judicial construction." *United La-*

*bor Comm. of Missouri v. Kirkpatrick,* 572 S.W.2d at 453.

Significantly, section 116.040 does not make any specified irregularity fatal. To the contrary, that section provides that the petition is sufficient if the form provided is followed substantially. This Court will not make those irregularities fatal by judicial construction. *United Labor,* 572 S.W.2d at 453. The general allegations of discrepancies of the voter's name, date, and address are not sufficient to disprove the validity of the voter's signature when the LEAs have specifically reviewed the signatures and matched them with registered voters. The signatures of persons who are alleged to have improperly completed the petition form were properly counted.

### D.

■ Intervenors next contend that signatures should not be considered valid if they appear on a page where the circulator's affidavit required by section 116.040, RSMo 2000, is incomplete or notarization is missing.

■ As stated in *United Labor,* "[i]f the validity of the voters' signatures can be otherwise verified, their signatures should not be invalidated by the notary's negligence or deliberate misconduct." 572 S.W.2d at 454. *United Labor* has not been invalidated by changes in the election laws and continues to establish the proper focus—Do the requisite numbers of signatures appear on the petition? The General Assembly has not declared the failure to comply with section 116.040 to be fatal; to the contrary, it continues to state that only substantial compliance with the statute is required.

Here, signatures were indeed verified by the LEAs. The circuit court properly focused on the signatures' validity and properly rejected Intervenors' attempt to

invalidate signatures because of errors committed by persons other than the signers.

### E.

■ Intervenors' next attack notes that the initiative power is limited by the constitution. "The initiative shall not be used for the appropriation of money other than of new revenues created and provided for thereby." Mo. Const. art. III, sec. 51. They urge that the initiative violates this proscription by: (1) failing to provide funding for the administrative costs incurred as a result of the new programs required by the initiative and (2) requiring continuation of the current level of funding for existing programs. Both contentions require a restricted reading of the initiative's language in a way that violates the constitution. But this Court must attempt to harmonize all provisions of the initiative's proposal with the constitution. *Consolidated School District No. 1 of Jackson County v. Jackson County*, 936 S.W.2d 102, 103–04 (Mo. banc 1996).

■ Section 8 of the initiative sets out uses to be made of the moneys raised. That section states that the moneys raised are to be appropriated "solely to provide additional funds for" specified purposes. If such purposes cannot be met without administrative costs, there is no prohibition on using the moneys raised to pay for the administrative costs necessary to provide additional funds for the specified purposes. This interpretation harmonizes the provisions of section 8 of the initiative and article III, section 51 of the state constitution, which this Court is required to do.[4]

■ Intervenors complain that section 12 of the initiative requires funding of existing programs at current levels.[5] This argument fails to harmonize the initiative's language with article III, section 51 of the state constitution. Section 12 does not restrict the General Assembly's ability to change the amount of appropriations to existing programs—it only prevents use of the new revenues to fund such programs; the initiative does not affect the General Assembly's ability to increase or decrease funding for existing programs with respect to other sources of revenue. Again, this interpretation harmonizes the provisions of section 12 of the initiative and article III, section 51 of the state constitution rather than creating an irreconcilable conflict.[6]

### F.

■ Intervenors' final argument is that the initiative petition violates article III,

---

**4.** Intervenors point to a fiscal note prepared by the State Auditor. The note was not presented to the circuit court, and the Committee's motion to strike it is sustained. *Slivka v. Hackley*, 418 S.W.2d 89, 90 (Mo.1967). In any event, as with an Attorney General's opinion, the Auditor's summary is not effective to make or to declare the law. *See Gershman Inv. Corp. v. Danforth*, 517 S.W.2d 33, 35 (Mo. banc 1974). Intervenors' motion for leave to file a second supplemental legal file is overruled as moot.

**5.** "12. The net proceeds from the tax imposed by this section shall constitute new and additional funding for the initiatives and programs described in this section and shall not be used to replace existing funding as of July

1, 2006 for the same or similar initiatives and programs."

**6.** Certain amici also seek to interpret the language of sections 8 and 12 of the proposal to show a violation of article III, section 51. This Court is not free to engage in such interpretations as the provisions must be harmonized. *Consolidated School District No. 1 of Jackson County*, 936 S.W.2d at 103–04. Amici are free to argue to the voters that the proposal is ill-advised, badly drafted, subject to abuse, or to advance other reasons to defeat it, but this Court is not free to adopt an interpretation finding an irreconcilable conflict when the provisions can be harmonized. The amici's interpretations must be rejected.

section 50 of the Missouri Constitution in that it contains multiple subjects.

Article III, section 50 states in part:

Petitions for constitutional amendments shall not contain more than one amended and revised article of this constitution, or one new article which shall not contain more than one subject and matters properly connected therewith, . . . .

■ The initiative petition's 3,300 words create a new tax on tobacco products, provide for the collection of the tax, set out the disbursement of the revenue, and require the Auditor to review "the impact of the programs, grants, and contracts performed."[7] The disbursement of the new revenues includes a portion to tobacco cessation programs and the balance of the moneys to the state Medicaid program.

Intervenors point out that the proposal alters and amends multiple articles of the constitution, namely: articles I, II, IV, IX, X, and XII. Further, Intervenors claim that two divergent subjects are contained in the proposal, namely tobacco cessation and an expansion of the state's Medicaid program, which they argue is unrelated to smoking.

■ When reviewing a single subject challenge to an initiative petition, this Court must liberally and non-restrictively construe the petition in such a way that the provisions connected with or incident to the central purpose of the proposal are harmonized and not treated as separate subjects. *Missourians to Protect the Initiative Process,* 799 S.W.2d at 830. A proposal may amend several articles in the constitution so long as all proposals are germane to a single purpose. *Id.* at 830–

831. In reviewing multiple subject claims, this Court "must scrutinize the proposal to see if all matters included relate to a readily identifiable and reasonably narrow central purpose." *Id.* at 831.

This Court has reviewed single subject arguments in *Buchanan v. Kirkpatrick,* 615 S.W.2d 6 (Mo. banc 1981), and *Missourians to Protect the Initiative Process.* In *Buchanan,* this Court reviewed the Hancock Amendment, which sought to amend multiple articles of the constitution. This Court held that all of the sections of the initiative petition were properly connected with the central or primary purpose of the petition, which was to limit taxes and governmental expenditures. *Id.* at 14.

In *Missourians to Protect the Initiative Process,* however, this Court determined that the proposed changes to the legislature and to the regulation of public officials' conduct were "so diverse as to defy being connected to a single central purpose." *Id.* at 832. The analysis in both these cases is consistent and instructive in this case.

Although Intervenors posit that there are two divergent purposes and subjects within the proposal, the clear, single purpose of the proposed amendment is to raise and disburse a tax. Article III, section 51 allows initiatives to appropriate new revenue and provide for its distribution. The obvious negative impact that tobacco products have on public health is addressed by the proposal raising taxes on tobacco products and disbursing the funds to tobacco cessation programs and to public health programs that include treating tobacco-related illnesses. This proposal's general purpose and the matters connect-

---

**7.** Intervenors object in the text of their argument to the Auditor being given new duties in violation of article IV, section 13 of the Missouri Constitution. Such objection is not set

out in their points relied on and is considered abandoned by this Court. *Brizendine v. Conrad,* 71 S.W.3d 587, 593 (Mo. banc 2002).

ed to it do not violate the single subject restriction of the state constitution.

## IV. Conclusion

Statutes implementing the constitutionally created initiative process should not restrict or limit the electorate's power. Although the implementing statutes are required to be followed, failure to adhere to mere technical formalities should not deny the people the power to propose changes to our laws or amendments to our constitution. Substantial compliance with the implementing statutes is all that is required.

Intervenors' various complaints of irregularities or discrepancies in petition signatures and circulators' affidavits are all without merit. The initiative petition submitted by the Committee contains the required number of valid signatures to be placed on the ballot for the November 2006 general election. The initiative petition's general purpose and the matters connected to it do not violate the single subject restriction of Missouri's constitution, nor does the petition appropriate money other than the new revenues it creates. Accordingly, the judgment of the circuit court is affirmed.

All concur.