Alok Ahuja, Judge
The Secretary of State certified Initiative Petition 2018-048 for inclusion on the November 2018 general election ballot. The Initiative Petition proposes to amend various provisions of Article III of the Missouri Constitution, which addresses the legislative department, and add three new sections to Article III. Respondents and Cross-Appellants Paul Ritter and Daniel P. Mehan filed this lawsuit in the Circuit Court of Cole County pursuant to § 195.200,[1] arguing that the Initiative Petition was invalid on multiple grounds, and that it should accordingly not appear on the ballot. Their lawsuit named Secretary of State John R. Ashcroft as the defendant. The proponents of the Initiative Petition, *80 Sean Soendker Nicholson and Clean Missouri, were permitted to intervene in the circuit court proceeding to defend the validity of the Petition.
The circuit court accepted two of Ritter and Mehan's challenges to the Initiative Petition. The court entered an injunction ordering the Secretary of State to rescind and withdraw his certification of the Initiative Petition, and instead issue a certificate finding the Initiative Petition to be insufficient.
Nicholson and Clean Missouri appeal, arguing that the Initiative Petition is valid, and should appear on the November 2018 general election ballot. We reverse.
Factual Background
Nicholson is a Missouri resident who serves as Deputy Treasurer of Clean Missouri. Clean Missouri is a campaign committee registered under chapter 130, RSMo; among its purposes is to support passage of the Initiative Petition.
On November 23, 2016, Nicholson submitted to the Secretary of State a sample sheet for what was later denominated Initiative Petition 2018-048. The Initiative Petition proposes to amend sections 2, 5, 7 and 19 of Article III of the Missouri Constitution, and to adopt three new sections to be known as sections 3, 20(c) and 20(d). A copy of the Petition is attached as an Appendix to this opinion.
The Initiative Petition would:
• require legislators and employees of the General Assembly to wait two years after the conclusion of the legislative session in which they last worked, before they could serve as paid lobbyists (§ 2);
• prohibit legislators and legislative employees from accepting gifts valued at more than $5.00 from paid lobbyists (§ 2(a) );
• prohibit candidates for the Senate from accepting campaign contributions of more than $2,500.00 in any one election cycle, and prohibit House candidates from accepting contributions of more than $2,000.00 (§ 2(c) );
• prohibit candidates from accepting contributions from any federal political action committee ("PAC"), unless the committee has filed the same financial disclosure reports as Missouri PACs (§ 2(f) );
• declare that legislative records are public records, and legislative proceedings are public meetings, subject to generally applicable public-access laws, including the "Sunshine Law" (§§ 19(b) and (c) ); and
• prohibit legislators and legislative candidates from engaging in political fundraising activities on State property (§ 20(c) ).
In addition, in new § 3, and in amendments to Article III, § 7, the Initiative Petition proposes to substantially modify the procedure for apportioning House and Senate Districts following a decennial census. (The reapportionment process for the House of Representatives currently appears in Article III, § 2.) The Petition proposes to establish a new position known as the "non-partisan state demographer," to be selected through an application process overseen by the State Auditor, and with the participation of the majority and minority leaders of the Senate. The non-partisan state demographer is charged with preparing proposed legislative re-districting plans and maps following the decennial census. In preparing those redistricting proposals, the demographer is charged with giving the districts "a total population as nearly equal as practicable to the ideal population for such districts," and with complying with the requirements *81 of the United States Constitution and federal laws, including the Voting Rights Act of 1965. The demographer is also directed that
Districts shall be designed in a manner that achieves both partisan fairness and, secondarily, competitiveness. Partisan fairness means that parties shall be able to translate their popular support into legislative representation with approximately equal efficiency. Competitiveness means that parties' legislative representation shall be substantially and similarly responsive to shifts in the electorate's preferences.
The Petition also directs the demographer to consider geographic contiguity, the boundaries of existing political subdivisions, and the compactness of the proposed districts. These considerations, however, are expressly subordinated to consideration of equal population, compliance with federal law, and partisan fairness and competitiveness.
Sections 3 and 7 of the Petition provide that, within six months following the release of the decennial census results, the non-partisan state demographer shall file with the Secretary of State "a tentative plan of apportionment and map of the proposed districts, as well as all demographic and partisan data used in the creation of the plan and map." The Petition largely retains the procedure found in the current Missouri Constitution for the Governor to select House and Senate reapportionment commissions with legislator input. Under the Petition, the reapportionment commissions are charged with holding at least three public hearings concerning the demographer's proposed apportionment plan. The commissions may make modifications to the demographer's proposed plan and map, but only "by a vote of at least seven-tenths of the commissioners." The Petition provides that, "[i]f no changes are made or approved as provided for in this subsection, the tentative plan of apportionment and map of proposed districts shall become final."
On December 6, 2016, the Secretary of State approved the Initiative Petition as to form. On January 5, 2017, the Secretary certified the official ballot title for the Petition. The summary statement portion of the official ballot title, written by the Secretary of State, reads as follows:
Shall the Missouri Constitution be amended to:
• change process and criteria for redrawing legislative districts during reapportionment;
• change limits on campaign contributions that candidates for state legislature can accept from individuals or entities;
• establish a limit on gifts that state legislators, and their employees, can accept from paid lobbyists;
• prohibit state legislators, and their employees, from serving as paid lobbyists for a period of time;
• prohibit political fundraising by candidates for or members of the state legislature on State property; and
• require legislative records and proceedings to be open to the public?
Clean Missouri gathered signatures on the Petition, and submitted those signatures to the Secretary of State on May 3, 2018. On August 2, 2018, the Secretary issued a certificate finding that 231,460 of the signatures submitted by Clean Missouri were valid. The Secretary found that the Initiative Petition complied with the requirements of the Missouri Constitution and chapter 116, RSMo, and directed that it be placed on the November 6, 2018 general election ballot.
Ritter and Mehan filed substantially similar petitions in the Circuit Court of *82 Cole County, alleging that the Initiative Petition was invalid on multiple grounds, and that the Secretary of State's certification of the Petition was erroneous and should be enjoined. Ritter and Mehan made the following claims: (1) that the Petition contains more than one subject in violation of Article III, § 50 and Article XII, § 2(b) of the Missouri Constitution (Count I); (2) that the Petition amends multiple articles of the Missouri Constitution in violation of Article III, § 50 and Article XII, § 2(b) (Count II); (3) that the Petition failed to properly set forth the text of the proposed measure, and of the constitutional provisions being amended or repealed, in violation of Article III, § 50 and § 116.050 (Count III); and (4) that the Petition fails to identify all provisions of the Constitution that would be amended or repealed by the Petition's adoptions, in violation of Article III, § 50 and Article XII, § 2(b) (Count IV).[2] The two cases were consolidated for hearing, and submitted to the circuit court on stipulated facts. Although Ritter and Mehan's petitions named only the Secretary of State as a defendant, Nicholson and Clean Missouri were permitted to intervene in both cases.
On September 14, 2018, the circuit court entered its Final Judgment and Order. The circuit court found on Count I that the Initiative Petition improperly addressed more than a single subject, because "the twenty or so substantive changes outlined in the Petition relate to at least two different and extremely broad purposes: (1) the organization of the General Assembly; and (2) ethics or campaign finance regulation aimed at avoiding misconduct by public officials in multiple branches and levels of government." The court found that, in this regard, the Initiative Petition "is hauntingly similar to a petition the Missouri Supreme Court found to violate the single subject rule in Missourians to Protect the Initiative Process [v. Blunt ], 799 S.W.2d [824,] 830 [ (Mo. banc 1990) ]."
The circuit court also found in Ritter and Mehan's favor on Count II, which alleged that the Petition violates Article III, § 50 and Article XII, § 2(b) of the Missouri Constitution because it amends or repeals provisions of more than one article of the Constitution. Although Nicholson and Clean Missouri argued that the Initiative Petition only regulates the legislature, and was confined to revising provisions of Article III of the Missouri Constitution, the circuit court concluded that the Petition addresses non-legislative matters currently addressed outside of Article III. Thus, the circuit court found that the Petition: would prohibit lobbying of the executive branch by "private employees" (namely, former legislators or legislative employees); would modify the campaign contribution limits enacted by initiative at the 2016 general election, which appear in Article VIII, § 23; would prohibit candidates for executive offices from accepting contributions from federal PACs in certain circumstances; would prohibit fundraising on state property for non-legislative races; would "create a new executive office called the [non-partisan] state demographer"; and would impose new duties on the State Auditor relating to the selection of the demographer.
The circuit court rejected, however, Ritter and Mehan's claim that the Initiative *83 Petition violated Article III, § 50 and § 116.150 by failing to accurately set out the text of the proposed new or revised constitutional provisions, and the text of the existing constitutional provisions to be repealed. The court found that Ritter and Mehan's complaints about the text of the Initiative Petition implicated only the requirements of § 116.150, not the requirements of the Constitution, and that "substantial compliance" with the statutory requirements was all that was required. The court found that "the errors identified by Plaintiffs are tantamount to scrivener's errors," which "do not alter the meaning or purpose of the constitutional text and thus do not rise to a level of misleading voters."
Finally, the circuit court concluded that the Petition did not violate Article III, § 50, Article XII, § 2(b), or § 116.050, by failing to identify all provisions of the Constitution which would be repealed or amended by the Petition. The court concluded that the other provisions Ritter and Mehan argued were affected by the Petition were merely "amend[ed] by implication," and were therefore not required to be mentioned in the Petition. The court observed that Ritter and Mehan's Count IV "sets an impossible standard for the proponents to meet [ ] and is therefore denied."
Based on its finding that the Initiative Petition was defective in the respects alleged in Counts I and II of the Ritter and Mehan petitions, the circuit court entered an injunction ordering "the Secretary of State to rescind and withdraw his certification of sufficiency of the Petition and issue a certificate of insufficiency for the Petition"; the court's judgment also purports to enjoin "all other officers from printing the measure on the ballot."
Nicholson and Clean Missouri filed their notices of appeal from the circuit court's judgment on the same day the judgment was entered, September 14, 2018. Ritter and Mehan thereafter filed cross-appeals to challenge the circuit court's rejection of the alternative arguments asserted in their Counts III and IV.[3] We entered a stay of the circuit court's judgment on September 18, 2018, and have heard and decided the appeal on a substantially expedited schedule.
Appellate Jurisdiction
In a letter dated September 19, 2018, Ritter's counsel argued that this appeal falls within the exclusive appellate jurisdiction of the Missouri Supreme Court under Article V, § 3 of the Missouri Constitution. Counsel's letter noted that, in their briefing Nicholson and Clean Missouri argue that, if the Initiative Petition is invalid because it fails to comply with the technical requirements of § 116.050, then § 116.050 constitutes an unconstitutional *84 burden on their right to invoke the initiative process.
The alternative constitutional argument asserted in Nicholson and Clean Missouri's cross-appeal response brief does not invoke the Supreme Court's exclusive appellate jurisdiction. In order to invoke the Supreme Court's exclusive jurisdiction based on a challenge to the validity of a state statute, the constitutional challenge must be " 'real and substantial, not merely colorable.' " Kirk v. State , 520 S.W.3d 443, 448 n.2 (Mo. banc 2017) (quoting McNeal v. McNeal-Sydnor , 472 S.W.3d 194, 195 (Mo. banc 2015) ). "[I]f the constitutional challenge has not been properly preserved for appellate review," the claim is not "real and substantial," and "jurisdiction remains with this court." Joshi v. St. Luke's Episcopal Presbyterian Hosp. , 142 S.W.3d 862, 866 (Mo. App. E.D. 2004) (citation omitted). "A constitutional challenge is waived if not raised at the earliest opportunity." Id. (citation omitted).
In this case, Nicholson and Clean Missouri did not assert an affirmative defense in their answers that § 116.050 was unconstitutional if it had the effect of invalidating the Initiative Petition. They did not raise the issue in their trial briefs filed with the circuit court, either. From all that appears from the record on appeal, the issue was not raised in the circuit court in any fashion. In these circumstances, the constitutional claim was waived, it is accordingly not real and substantial, and it does not invoke the Supreme Court's exclusive appellate jurisdiction under Article V, § 3.
In their response to the letter from Ritter's counsel, Nicholson and Clean Missouri claim that they did not intend to assert a constitutional challenge to the validity of § 116.050. Instead, they assert that they merely intended to invoke the doctrine of "constitutional avoidance": that this Court should not interpret § 116.050 as Ritter and Mehan suggest in order to avoid a constitutional problem. If this is what Nicholson and Clean Missouri's appellate arguments intended, the result is the same: jurisdiction properly lies in this Court. To invoke the Supreme Court's exclusive jurisdiction, " 'the constitutionality of the statute must be directly challenged. To say that a statute would be unconstitutional if construed in a certain manner does not meet the requirement.' " City of Slater v. State , 494 S.W.3d 580, 585 (Mo. App. W.D. 2016) (quoting Knight v. Calvert Fire Ins. Co. , 260 S.W.2d 673, 675 (Mo. 1953) ).
Standard of Review
Because [this] case was submitted on stipulated facts and did not involve the trial court's resolution of conflicting testimony, our review is not governed by Murphy v. Carron , 536 S.W.2d 30, 31 (Mo. banc 1972 [1976]) ; rather the only question before this court is whether the trial court drew the proper legal conclusions from the facts stipulated. Thus, our review is de novo.
Chastain v. James , 463 S.W.3d 811, 817 (Mo. App. W.D. 2015) (internal quotation marks omitted) (citing Archey v. Carnahan , 373 S.W.3d 528, 531 (Mo. App. W.D. 2012) ).
Discussion
Before we address Ritter and Mehan's specific challenges to the Initiative Petition, we repeat the "general observations" offered by the Missouri Supreme Court almost thirty years ago:
Nothing in our constitution so closely models participatory democracy in its pure form. Through the initiative process, those who have no access to or *85 influence with elected representatives may take their cause directly to the people. The people, from whom all constitutional authority is derived, have reserved the "power to propose and enact or reject laws and amendments to the Constitution." Mo.Const. art. III, § 49. When courts are called upon to intervene in the initiative process, they must act with restraint, trepidation and a healthy suspicion of the partisan who would use the judiciary to prevent the initiative process from taking its course. Constitutional and statutory provisions relative to initiative are liberally construed to make effective the people's reservation of that power.
Missourians to Protect the Initiative Process v. Blunt , 799 S.W.2d 824, 827 (Mo. banc 1990).
I.
Nicholson and Clean Missouri first argue that the circuit court erred in finding that the Initiative Petition violates the "single subject" restriction contained in Article III, § 50 of the Missouri Constitution.
Article III, § 50 provides in relevant part:
Petitions for constitutional amendments shall not contain more than one amended and revised article of this constitution, or one new article which shall not contain more than one subject and matters properly connected therewith, and the enacting clause thereof shall be "Be it resolved by the people of the state of Missouri that the Constitution be amended:".
Article XII, § 2(b) of the Constitution repeats this "single subject" rule. It provides that "[n]o such proposed amendment shall contain more than one amended and revised article of this constitution, or one new article which shall not contain more than one subject and matters properly connected therewith."[4]
In Blunt , the Missouri Supreme Court explained that
the purpose of the prohibition on multiple subjects in a single ballot proposal is to prevent "logrolling," a practice familiar to legislative bodies whereby unrelated subjects that individually might not muster enough support to pass are combined to generate the necessary support. The prohibition is intended to discourage placing voters in the position of having to vote for some matter which they do not support in order to enact that which they earnestly support. The single subject matter rule is the constitutional assurance that within the range of a subject and related matters a measure must pass or fail on its own merits.
Id. at 830 (citation omitted).
Challenges to an initiative petition on the basis that it "contain[s] more than one subject and matters properly connected therewith" are appropriately addressed prior to the election at which the *86 measure is to be submitted to voters. The Blunt decision explains that
[a]ny reasonable construction of the quoted language leads to the inescapable conclusion that regardless of the meritorious substance of a proposition, if the prerequisites of article III, § 50 are not met, the proposal is not to be on the ballot. Any controversy as to whether the prerequisites of article III, § 50 have been met is ripe for judicial determination when the Secretary of State makes a decision to submit, or refuse to submit, an initiative issue to the voters. At that point, a judicial opinion as to whether the constitutional requirements have been met is no longer hypothetical or advisory.
Id. at 828.
The Blunt case also held that the directive that an initiative position "shall not contain more than one subject and matters properly connected therewith" applies equally to initiatives which propose to amend or revise existing articles of the Constitution, and to initiatives which propose to adopt new articles (even though the punctuation of the relevant provision, and the "rule of the last antecedent,"[5] might suggest otherwise). Id. at 829-30.
In addressing a "single subject" challenge, we read an initiative petition in a manner favoring its validity.
When reviewing a single subject challenge to an initiative petition, this Court must liberally and non-restrictively construe the petition in such a way that the provisions connected with or incident to the central purpose of the proposal are harmonized and not treated as separate subjects. A proposal may amend several articles in the constitution so long as all proposals are germane to a single purpose. In reviewing multiple subject claims, this Court "must scrutinize the proposal to see if all matters included relate to a readily identifiable and reasonably narrow central purpose."
Comm. for a Healthy Future, Inc. v. Carnahan , 201 S.W.3d 503, 511 (Mo. banc 2006) (citing and quoting Blunt , 799 S.W.2d at 830-31 ); see also , e.g. , Kuehner v. Kander , 442 S.W.3d 224, 230-31 (Mo. App. W.D. 2014). "A measure may encompass one subject, and yet effect several changes and incidents, if all are germane to its one controlling purpose." United Gamefowl Breeders Ass'n of Missouri v. Nixon , 19 S.W.3d 137, 140 (Mo. banc 2000) (citing Blunt , 799 S.W.2d at 830-31 ).
Construing the Initiative Petition "liberally and non-restrictively," we conclude that the Petition's multiple provisions all relate to a single central purpose: regulating the legislature to limit the influence of partisan or other special interests. In rejecting Ritter and Mehan's "single subject" challenge, it is significant that all of the constitutional amendments proposed in the Initiative Petition properly fall within the scope of Article III of the Missouri Constitution. Indeed, neither Ritter nor Mehan argues that the provisions of the Initiative Petition do not properly belong in Article III (at least to the extent that the Initiative Petition regulates the conduct of legislators or legislative employees, or the manner in which legislative districts are established).
In the Blunt case, the Missouri Supreme Court emphasized that the separate articles of the Constitution address separate subjects, and that matters which properly fal within a single article of the Constitution *87 will generally be deemed to address "one subject." Thus, in Blunt , the Court explained:
the constitution is organized by subject into various articles. Each article is subdivided into sections. The sections relate to specific matters connected with the general heading of the article. The concept of "one amended or revised article" carries with it the connotation of a single subject and connected matters. To say an amendment must be limited to "one amended and revised article ... which shall not contain more than one subject and matters properly connected therewith," is somewhat redundant.
799 S.W.2d at 830 (boldface emphasis added).
Later in its opinion, the Court stated that the organization of the Constitution into separate articles is "strong evidence" of how the Constitution's framers interpreted the phrase "one subject."
The constitution is divided into separate articles. The legislative department is provided for in article III. The executive department, its officers, and their responsibilities are provided for under article IV of the constitution. Public officials, in general, regulation of their conduct, and sanctions against their misconduct have heretofore been the subject of article VII. The organization of the constitution creates a presumption that matters pertaining to separate subjects therein described should be set forth in the article applicable to that subject and not commingled under unrelated headings. The organizational headings of the constitution are strong evidence of what those who drafted and adopted the constitution meant by "one subject."
Id. at 831 (emphasis added).[6]
Taking these statements together, if various proposed constitutional amendments all properly fall within the scope of a single article of the Constitution, those amendments will generally be considered to address "one subject and matters properly connected therewith."[7]
*88 In this case, all of the constitutional amendments proposed by the Initiative Petition fall under Article III of the Constitution, which addresses the "Legislative Department." Indeed, all of the proposed amendments relate to matters contained in the first 20 sections of Article III - which address the establishment of legislative districts, legislator qualifications, legislative elections, and disqualification of legislators from holding certain other offices. None of the provisions of the Initiative Petition relate to the other subdivisions of Article III - which specify procedural rules for legislative proceedings; substantive limitations on legislative power; the State lottery; and the initiative and referendum mechanisms. As stated previously, all of the provisions in the Initiative Petition seek to regulate the manner in which legislators are elected and how they conduct themselves, to limit the influence of partisan or other special interests. Because all of the Petition's proposals properly fall within the matters addressed in the first subdivision of existing Article III, they address "one subject and matters properly connected therewith" as the phrase was interpreted in Blunt .[8]
In the Blunt case, the Missouri Supreme Court held that an initiative petition violated Article III, § 50 's "single subject" rule because the proposed constitutional revisions addressed two different subjects: "1) a general reorganization of the legislative department including the number of members and session length of the General Assembly, article III matters, and 2) the general regulation of the conduct of public officials, [including executive branch officials,] an article VII matter." 799 S.W.2d at 832. The initiative petition in Blunt expressly applied new rules of conduct, and new sanctions, to non-legislative officials. As the Court explained,
The new provisions of the proposal, beginning with § 54, create an ethics commission having authority to 1) regulate those who lobby legislators or members of the executive branch , 2) require legislators, members of the executive branch and other state officials and employees to file financial disclosures, and 3) enforce specified ethical restrictions against legislators and members of the executive branch. Finally, the new provisions authorize imposition of sanctions against members of the General Assembly, members of the executive branch , and other public officials for ethical conduct violations. From this description of the proposal, it is apparent that the *89 amendment would substantially reorganize the legislature and, at the same time, impose constitutional ethical restrictions on officers, officials, and employees of the legislative and executive departments.
799 S.W.2d at 831 (emphasis original).
The circuit court's judgment concluded that the Initiative Petition in this case was "hauntingly similar" to the petition at issue in the Blunt case, because "the Petition combines a redesign of the process and standards for drawing General Assembly districts ... with a series of provisions meant to avoid misconduct by public officials in all three branches of state government, as well as county and local governments...." The circuit court cited a number of respects in which it believed the Petition extended beyond the legislature. We conclude that the Petition does not regulate other branches of government in the manner the circuit court found.
The circuit court first held that the two-year waiting period before legislators or legislative employees could serve as paid lobbyists (§ 2) extended beyond the proper scope of Article III, because "it applies to any lobbying, including lobbying of the executive branch," and "purports to block private employees ... from lobbying the executive branch." Contrary to the circuit court's characterization, § 2 proposes to regulate the conduct of present and former legislators and legislative-branch employees, based on their service in the legislative branch; it does not purport to regulate the conduct of "private employees" generally. Moreover, while § 2 may prevent legislators and legislative employees from lobbying the executive as well as legislative branches, the focus of the provision is on the conduct of legislative-branch officials, not on the governmental agencies to which their lobbying activity might be directed.
Next, the circuit court cited § 2(c) of the Petition, which provides that "[t]he General Assembly shall make no law authorizing unlimited campaign contributions to candidates for the General Assembly, nor any law that circumvents the contribution limits contained in this Constitution." The circuit court complained that the "anti-circumvention" provisions improperly "applies to contributions to candidates for executive branch offices, candidates for judicial offices, political parties, and political party committees," and therefore extends beyond the purpose of regulating legislative matters. We are not persuaded. First, it is plain from the face of § 2(c) that it prohibits conduct by the General Assembly , the branch of government addressed in Article III. Further, "the contribution limits" to which the "anti-circumvention" provision applies appear to be the limits on "campaign contributions to candidates for the General Assembly" referenced in the first part of the sentence. Even if the "anti-circumvention" provision is interpreted to apply to contribution limits governing non-legislative elections, like the lobbying restrictions the primary focus of § 2(c) is plainly to prevent the legislature from facilitating the evasion of the contribution limits specified in the Constitution, not on the nature of the elections the legislature is restricted from regulating.
As a third example, the circuit court's judgment cites § 2(f) of the Petition, which provides that "[n]o candidate shall accept contributions from any federal political action committee unless the committee has filed the same financial disclosure reports that would be required of a Missouri political action committee." The circuit court concluded that this provision imposes limitations on non-legislative candidates, since it is not expressly limited to candidates for legislative office. We disagree.
*90 The Missouri Supreme Court has explained that
The fundamental purpose of constitutional construction is to give effect to the intent of the voters who adopted the Amendment. Traditional rules of construction dictate looking at words in the context of both the particular provision in which they are located and the entire amendment in which the provision is located.
Context determines meaning.
Keller v. Marion Cnty. Ambulance Dist. , 820 S.W.2d 301, 302 (Mo. banc 1991) (citation omitted).
In this case, the context in which § 2(f) appears plainly indicates that the provision is directed to candidates for legislative office. If adopted, § 2(f) will be inserted into Article III of the Missouri Constitution, and it appears in what would be a new § 2, which addresses legislators' receipt of gifts, post-legislative employment, and receipt of campaign contributions. In addition, the three sub-sections immediately preceding subsection (f) all relate to the campaign contributions received by candidates for legislative office.[9] While § 2(f) may use the unqualified term "candidate," the context in which that term appears clearly indicates that the provision addresses only candidates for legislative office; the provision does not improperly regulate candidates for other offices.[10]
The circuit court also focused on the redistricting provisions included in the Initiative Petition, and observed that these provisions "create a new executive office called the state demographer, and assign a new duty to another executive branch official, the State Auditor, to select all candidates for the office of state demographer." While §§ 3 and 7 of the Petition may incidentally place responsibilities on the State Auditor, and create the position of non-partisan state demographer,[11] the central purpose of those provisions is to specify the manner in which legislative districts are reapportioned following a decennial census. The reapportionment of legislative districts is plainly a legislative matter which has been addressed in the first subdivision of Article III since the adoption of the 1945 Constitution. Sections 3 and 7 are plainly connected with the central purpose of the Initiative Petition, to regulate the election and conduct of legislators and legislative employees to limit the influence of partisan or other special interests.
It is significant in this regard that the existing reapportionment provisions contained in Article III already involve the executive and judicial branches in the redistricting process: the Governor appoints the members of the House and Senate *91 reapportionment commissions; and members of the judiciary serve on a reapportionment commission of last resort, in the event the commission appointed by the Governor is unable to come to a resolution. Given that the existing reapportionment process specified in Article III already involves officials from other branches of government, the fact that the Initiative Petition's proposed reapportionment process does likewise is not surprising, nor improper.
As a final example of ways in which the Initiative Petition would purportedly regulate non-legislative officials and agencies, the circuit court cited § 20(c) of the Petition, which prohibits "any member of or candidate for the general assembly" from engaging in "political fundraising activities" "in or on any premises, property or building owned, leased or controlled by the State of Missouri or any agency or division thereof." Section 20(c) explicitly provides that it applies to fundraising activities or events "supporting or opposing any candidate, initiative petition, referendum petition, ballot measure, political party or political committee."
The circuit court held that, because § 20(c) applies to non-legislative political contests, "[i]n most applications, this will be primarily a regulation of those other campaigns and the use of state property-not of the legislature." We disagree. As we explained with respect to the conduct restrictions in § 2 of the Initiative Petition, § 20(c) is primarily directed at legislators and candidates for legislative office. The purpose of the provision is to prevent those persons from engaging in specified political activity on public property. The nature of the political activity which is prohibited, and the location where legislators and legislative candidates are prohibited from engaging in that activity, are plainly secondary considerations. We also question the circuit court's conclusion that the political activities which § 20(c) would prohibit "primarily" relate to non-legislative races. We presume that, for most legislators and legislative candidates, their primary political activities involve their own legislative elections, even if they might also assist other political candidates and causes.
For all of these reasons, we reverse the circuit court's conclusion that the Initiative Petition violates the "single subject" restriction contained in Article III, § 50, and in Article XII, § 2(b), of the Missouri Constitution.
II.
In Count II of their petitions, Ritter and Mehan argued that the Initiative Petition improperly amends or revises more than one article of the Missouri Constitution, in violation of Article III, § 50, and Article XII, § 2(b) of the Constitution. The circuit court found that the Initiative Petition violates the "single article" principle for many of the same reasons the court concluded that the Petition violated the "single subject" requirement: because it regulates and imposes duties on non-legislative officials and activities; and because it directly conflicts with the campaign contribution limits stated in Article VIII, § 23.3(1)(a).
Ritter and Mehan's arguments in support of their "single article" challenge are similar to the arguments they make in support of their "single subject" argument (discussed in § 1, above), and in support of their argument that the Petition improperly fails to notify voters of the provisions of other Articles with which the Petition's provisions directly conflict (discussed in § IV, below). As we explain in connection with those other arguments: even though the provisions of the Initiative Petition may incidentally affect non-legislative officials *92 and activities, the provisions of § 2 of the Petition are not directed to regulating non-legislative officials, non-legislative elections, or non-legislative activities; the placement of certain additional duties on the State Auditor, and the creation of the position of non-partisan state demographer, are primarily related to the modification of the legislative redistricting process, and only incidentally place additional duties on non-legislative officials; the placement of additional duties on the State Auditor does not directly conflict with Article IV, § 13 of the Constitution, which specifies the Auditor's other duties; and the campaign contribution limits specified in § 2(c) of the Petition do not directly conflict with, or repeal, the uniform contribution limits for all State elections specified in Article VIII, § 23.3(1)(a).
On its face, the Initiative Petition does not amend any provisions of the Constitution other than those contained in Article III. For the reasons explained in greater detail in §§ I and IV of this opinion, we conclude that the Petition does not implicitly amend provisions of other Articles. But even if the Petition did amend constitutional provisions beyond Article III, it is well-established that "[a] proposal may amend several articles in the constitution so long as all proposals are germane to a single purpose." Comm. for a Healthy Future, Inc. v. Carnahan , 201 S.W.3d 503, 511 (Mo. banc 2006) (citing Blunt , 799 S.W.2d at 830-31 ); accord Moore v. Brown , 350 Mo. 256, 165 S.W.2d 657, 662 (Mo. banc 1942) ("[O]ne constitutional amendment may change several articles or sections of a Constitution if all these changes are germane to a single controlling purpose."). As we have explained in § I, above, all of the provisions in the Initiative Petition are addressed to a single, constitutionally-appropriate subject: regulating the legislature to limit the influence of partisan or other special interests. Therefore, even if the provisions of the Petition are construed to amend non-Article III constitutional provisions sub silentio , the Petition does not violate Article III, § 50, or Article XII, § 2(b).
The circuit court erred by finding the Petition insufficient for the reasons stated in Count II of Ritter and Mehan's petitions.
III.
In Count III of their petitions, Ritter and Mehan argued that the Initiative Petition is defective for failing to accurately set forth the text of the Initiative. Among other things, Ritter and Mehan complained that the Petition misquotes the text of current Article III, § 2 (addressing the reapportionment of legislative districts) which the Petition proposes to delete. The circuit court rejected this claim on the basis that "[t]he requirement to bracket all deleted matter ... is not found in Missouri's Constitution," but is instead "a statutory requirement which merely requires substantial compliance." The court found that "the errors identified by Plaintiffs are tantamount to scrivener's errors" which "do not alter the meaning or purpose of the constitutional text and thus do not rise to a level of misleading voters."
Ritter and Mehan argue that the requirement to accurately state the current constitutional text slated for deletion derives both from Article III, § 50, and from § 116.050.2. As relevant here, Article III, § 50 provides that an initiative petition must contain "the full text of the measure." Section 116.050.2 provides in relevant part:
The full and correct text of all initiative and referendum petition measures shall:
(1) Contain all matter which is to be deleted included in its proper place enclosed *93 in brackets and all new matter shown underlined;
(2) Include all sections of existing law or of the constitution which would be repealed by the measure; and
(3) Otherwise conform to the provisions of Article III, Section 28 and Article III, Section 50 of the Constitution and those of this chapter.
Ritter and Mehan cite no authority which holds that the constitutional requirement that an initiative petition include "the full text of the measure" includes the requirement that all text proposed to be deleted be set forth in full. Notably, this requirement is made explicit in the implementing statute, which requires that the petition "[c]ontain all matter which is to be deleted included in its proper place enclosed in brackets." § 116.050.2(1). We also note that Article III, § 50, which requires that an initiative petition contain "the full text of the measure," contrasts with Article III, § 28, which specifies the required format for bills amending existing statutes. Article III, § 28 provides in relevant part that "[n]o act shall be amended by providing that words be stricken out or inserted, but the words to be stricken out, or the words to be inserted, or the words to be stricken out and those inserted in lieu thereof, together with the act or section amended, shall be set forth in full as amended." Ritter and Mehan ask us, without supporting authority, to hold that Article III, § 50implicitly requires what Article III, § 28 and § 116.050.2(1) require expressly. As the Supreme Court has recognized, however, "[t]he initiative power set forth in art. III, § 50 of the Missouri Constitution is broad and is not laden with procedural detail." United Labor Comm. of Mo. v. Kirkpatrick , 572 S.W.2d 449, 454 (Mo. banc 1978). We consider the claim in Count III - that the Initiative Petition failed to accurately reproduce the existing constitutional language proposed to be deleted - as a claim solely under § 116.050.2(1).
Although in the circuit court Ritter and Mehan raised multiple formatting and typographical errors in the Petition in support of Count III, on appeal they focus on a single error: the misquotation of a single phrase of the existing constitutional text slated for deletion by the Initiative Petition.
In connection with the reapportionment of House districts following a decennial census, the Initiative Petition proposes to delete the following five paragraphs which currently appear in Article III, § 2. The Petition accurately includes all five paragraphs in brackets, the formatting convention specified in § 116.050.2(1). We have put in bold-face and brackets the true constitutional text which the Petition erroneously omitted; we have used italics and underlining to indicate the text which mistakenly appears in the Petition.
The commission shall reapportion the representatives by dividing the population of the state by the number one hundred sixty-three and shall establish each district so that the population of that district shall, as nearly as possible, equal that figure.
Each district shall be composed of contiguous territory as compact as may be.
Not later than five months after the appointment of the commission[,] the commission shall [file with the secretary of state a]receive the tentative plan of apportionment and map of the proposed districts ordered in subsection 4 of this section and during the ensuing fifteen days shall hold such public hearings as may be necessary to hear objections or testimony of interested persons.
*94 Not later than six months after the appointment of the commission, the commission shall file with the secretary of state a final statement of the numbers and the boundaries of the districts together with a map of the districts, and no statement shall be valid unless approved by at least seven-tenths of the members.
After the statement is filed members of the house of representatives shall be elected according to such districts until a reapportionment is made as herein provided, except that if the statement is not filed within six months of the time fixed for the appointment of the commission, it shall stand discharged and the house of representatives shall be apportioned by a commission of six members appointed from among the judges of the appellate courts of the state of Missouri by the state supreme court, a majority of whom shall sign and file its apportionment plan and map with the secretary of state within ninety days of the date of the discharge of the apportionment commission. Thereafter members of the house of representatives shall be elected according to such districts until a reapportionment is made as herein provided.
In evaluating whether the errors illustrated above invalidate the Initiative Petition, we are mindful that statutory requirements must not be applied in an overly strict or technical manner. The Supreme Court has instructed that
Statutes implementing the constitutionally created initiative process should not restrict or limit the electorate's power. Although the implementing statutes are required to be followed, failure to adhere to mere technical formalities should not deny the people the power to propose changes to our laws or amendments to our constitution. Substantial compliance with the implementing statutes is all that is required.
Comm. for a Healthy Future, Inc. v. Carnahan , 201 S.W.3d 503, 512 (Mo. banc 2006).
We have little difficulty concluding that the Initiative Petition substantially complied with § 116.050.2(1), despite the regrettable error in quoting certain of the text to be deleted from current Article III, § 2. The main innovations proposed by the Initiative Petition for the redistricting process are to alter the substantive standards which guide the drawing of new districts, and to provide for a non-partisan official to create a reapportionment plan which the House and Senate reapportionment commissions can only modify by super-majority votes. The thrust of the Petition is not to alter the procedures under which the existing reapportionment commissions operate.
The misquotations in the Petition relate only to how the existing House reapportionment commission publicizes its tentative reapportionment plans and maps prior to holding public hearings. The Petition accurately quotes the provisions laying out the timetable for the commission's work, requiring the commission to hold public hearings, specifying how the commission adopts a final reapportionment plan, and specifying the effect of the commission's adoption of that plan. Importantly, the Petition accurately reflects that substantial portions of the existing reapportionment process will be repealed, and accurately indicates the beginning and ending of the deleted matter. Given the nature of the amendments proposed by the Initiative, and the nature of the misquotation Ritter and Mehan have identified, we agree with the circuit court that the error does not present a risk of misleading voters as to the merits of the Initiative Petition. The circuit court correctly held that the Petition's *95 minor technical noncompliance with the requirements of § 116.050.2(1) provided no basis to declare the Petition invalid.
IV.
Ritter and Mehan also argue that the circuit court erred in rejecting Count IV of their petitions, which argued that the Initiative Petition was defective because it failed to identify the existing provisions of the Constitution with which the provisions of the Petition were in direct conflict, and which would accordingly be repealed by the Petition.
Ritter and Mehan cite to both Article III, § 50 and § 116.050 to support their claim that the Initiative Petition was required to identify existing constitutional provisions with which the Initiative Petition was in "direct conflict." The relevant text of Article III, § 50 provides that "[e]very [initiative] petition ... shall contain ... the full text of the measure." Section 116.050.2(2) provides in relevant part that "[t]he full and correct text of all initiative and referendum petition measures shall ... [i]nclude all sections of existing law or of the constitution which would be repealed by the measure...."
The parties debate whether the requirement to set forth the constitutional provisions which an initiative would repeal is imposed by the Constitution, or instead solely by § 116.050; they also debate whether compliance with the requirement must be strict, or only substantial. It is unnecessary for us to resolve this issue, because whether the requirement to identify directly conflicting provisions of existing law is of constitutional or statutory origin, the Initiative Petition did not violate it.[12]
In order for provisions proposed in an initiative petition to be in "direct conflict" with existing law, it is not enough that the provisions of existing law "will be changed or affected by the amendment." Buchanan v. Kirkpatrick , 615 S.W.2d 6, 15 (Mo. banc 1981). Instead, the provisions of the petition must be "in direct conflict with or ... irreconcilably repugnant" to existing law. Id. As explained in Knight v. Carnahan , 282 S.W.3d 9 (Mo. App. W.D. 2009), "repeal" as used in § 116.050 means
[t]he abrogation or annulling of a previously existing law by the enactment of a subsequent statute which declares that the former law shall be revoked *96 and abrogated (which is called 'express' repeal), or which contains provisions so contrary to or irreconcilable with those of the earlier law that only one of the two statutes can stand in force (called 'implied' repeal).
[ BLACKS LAW DICTIONARY ] 1299 [ (6th ed. 1990) ] (emphasis added).
Following the plain and ordinary meaning, we find section 116.050 does not require initiative proponents to include all those provisions "affected," "impacted," or "modified" by a proposed measure. Moreover, requiring proponents to "ferret out" all such potential conflicts in the abstract would tend to stifle the initiative process.
Knight , 282 S.W.3d at 19.
Ritter and Mehan first argue that § 2(c) of the Initiative Petition, which establishes campaign contribution limits of $2,500.00 per election cycle for Senate candidates, and $2,000.00 per election cycle for House races, "directly conflicts" with Article VIII, § 23.3(1)(a). The latter provision sets a limits of $2,600.00 in per-cycle contributions in races "[t]o elect an individual to the office of governor, lieutenant governor, secretary of state, state treasurer, state auditor, attorney general, office of state senator, office of state representative or any other state or judicial office."
The contribution limits established in § 2(c) of the Initiative Petition do not "directly conflict" with Article VIII, § 23.3(1)(a), for at least two reasons: first, § 2(c) merely imposes additional limitations on certain political contributions regulated by § 23.3(1)(a), and it is obviously possible for individuals to comply with the restrictions in both provisions; and second, § 2(c) will not wholly supplant the contribution limits specified in § 23.3(1)(a), which will remain effective with respect to all state-wide executive elections, as well as judicial elections. This is not a case where § 2(c) "contains provisions so contrary to or irreconcilable with those of [§ 23.3(1)(a) ] that only one of the two statutes can stand in force." Knight , 282 S.W.3d at 19.
The lack of a "direct conflict" in this case is illustrated by the Missouri Supreme Court's decision in Buchanan , and by our decision in Knight . Buchanan , 615 S.W.2d 6, involved the initiative petition which adopted the constitutional taxing and spending limitations known as the "Hancock Amendment." Although the initiative petition listed twenty-eight existing sections of the Constitution which would be affected by its adoption, challengers of the amendment argued that the petition failed to mention many others. For example, § 16 of the initiative provided that "[p]roperty taxes and other local taxes and state taxation and spending may not be increased above the limitations specified herein without direct voter approval as provided by this constitution." The petition's challengers argued that this provision would directly conflict with Article IV, Section 34 of the existing Constitution, which provided that "the state auditor shall determine the rate of taxation ... necessary to raise the amount of money needed to pay the principal and interest maturing in the next succeeding year...." Although the existing constitution gave the State Auditor the authority to determine an appropriate rate of taxation, and the amendment limited that authority by requiring voter approval where the Hancock Amendment's limitations would be exceeded, the Supreme Court found none of the Hancock Amendment's far-reaching provisions "are in direct conflict with or are irreconcilably repugnant to the Constitution." Buchanan , 615 S.W.2d at 15.
Similarly, in Knight , 282 S.W.3d 9, an initiative petition proposed to cap the number of excursion gambling boat licenses *97 which could be issued by the Missouri Gaming Commission at "the number of licenses which have been approved for excursion gambling boats already built and those [currently] under construction." Challengers argued that the initiative petition was in direct conflict with § 313.812.1, RSMo 2000 (which provided that the Gaming Commission "shall decide the number, location and type of excursion gambling boat[s] in a city or county"); with § 313.805(2), RSMo 2000 (which gave the Commission the power "[t]o license the operators of excursion gambling boats ... and adopt standards for licensing"); and with § 313.004.5, RSMo 2000 (which transferred to the Commission "all the authority [previously held by the state tourism commission] relating to the regulation of excursion gambling boats").
We concluded that the conflict between the initiative petition, and the Gaming Commission's existing statutory authority, was not so direct as to require that §§ 313.812.1, 313.805(2), and 313.004.5, be identified as provisions "repealed" by the initiative. We explained:
Here, Proposition A's limitation on the number of licenses that may be issued is a limitation on the statutory authority of the Gaming Commission granted by sections 313.812.1, 313.805, and 313.004. It consequently affects or modifies these provisions of chapter 313. Proposition A is not, however, so irreconcilable with these provisions that it necessarily negates them. Consequently, they were not "deleted" or "repealed," and section 116.050 did not require the petition to include these sections.
282 S.W.3d at 19 (emphasis added).
In Knight , the Gaming Commission had pre-existing authority to determine "the number ... of excursion gambling boat[s] in a city or county," to issue licenses and adopt standards for licensing, and to exercise "all the authority ... relating to the regulation of excursion gambling boats." If adopted, the initiative would sharply curtail the Commission's pre-existing regulatory and licensing authority, by capping the number of excursion gambling boat licenses at the number in existence on the date the initiative became effective. Although the initiative would impose a specific numerical limit on the Commission's previously unlimited authority to issue gambling boat licenses, we held that the initiative merely "limit[ed]," "affect[ed]" or "modifie[d]" the Commission's licensing authority, but did not repeal or negate it.
The same is true here. The contributions limits in the Initiative Petition do not repeal or negate the contribution limits specified in Article VIII, § 23.3(1)(a). Section 2(c) of the Initiative Petition merely "modifies" and "limits" the contribution limit specified in § 23.3(1)(a), with respect to only two of the categories of elections to which § 23.3(1)(a) applies. The limits in § 23.3(1)(a) continue to apply to all contested state elections. If the Petition passes, contributors to state legislative races will also have to comply with the limits in § 2(c).
Ritter and Mehan also argue that the § 3 of the Initiative Petition, which obligates the State Auditor to oversee the process by which the non-partisan state demographer is selected, is in "direct conflict" with Article IV, § 13, which specifies that "[n]o duty shall be imposed on [the State Auditor] by law which is not related to the supervising and auditing of the receipt and expenditure of public funds." Section 3 of the Initiative Petition is not in conflict with this provision, however. The new constitutional provisions which the Initiative Petition proposes are not the type of "laws" to which Article IV, § 13 is referring; the prohibition on imposing new *98 duties on the State Auditor does not apply to provisions of the Constitution itself.
It is well-established that the term "law" as used in the Constitution generally refers to a statute. Thus, in Thompson v. Committee on Legislative Research , 932 S.W.2d 392 (Mo. banc 1996), the Supreme Court interpreted Article III, § 35 of the Missouri Constitution, which charges the Joint Committee on Legislative Research with performing "duties ... assigned to it by law." The Court explained that a "law," as that term was used in Article III, "is a bill passed by the house of representatives and the senate that is approved by the governor, not acted upon by the governor within the time limits established in article III, section 31, or approved by two-thirds of the members of the house of representatives and the senate following a gubernatorial veto." 932 S.W.2d at 395 n.2 (citations omitted); see also Moore v. Brown , 350 Mo. 256, 165 S.W.2d 657, 664 (Mo. banc 1942) (interpreting Article X, § 19, which provides that payments may be made from the State treasury only "in pursuance of an appropriation by law"; emphasizing that the Constitution draws "a clear distinction between the words 'law' and 'constitutional amendments' ").
Because the Initiative Petition is not a "law" in the relevant sense, when § 3 imposes duties on the State Auditor it does not violate or conflict with Article IV, § 13, which specifies that "[n]o duty shall be imposed on [the State Auditor] by law."[13]
The circuit court did not err in denying relief on Count IV of Ritter and Mehan's petitions.
Conclusion
The circuit court erred in holding that the Initiative Petition was insufficient, and in ordering the Secretary of State to rescind his certification of the Initiative Petition and to instead issue a certificate finding the Petition insufficient. The Secretary of State correctly declared that the Initiative Petition was sufficient, and correctly directed that the Petition appear on the November 2018 general election ballot.
The judgment of the circuit court is reversed.[14]
All concur.
APPENDIX TO THE OPINION OF THE COURT
*99 *100 *101 *102 *103 --------

Unless otherwise indicated, statutory citations refer to the 2016 edition of the Revised Statutes of Missouri, updated by the 2017 Supplement.

Ritter and Mehan's petitions also contained a Count V, which alleged that the Initiative Petition violates the free speech guarantees of the United States and Missouri Constitutions. The circuit court held that Count V's attack on the substantive constitutionality of the Petition would not be ripe unless and until voters actually approved the measure. The parties have not challenged the circuit court's disposition of Count V on appeal, and we do not further address it.

In their cross-appeals, Ritter and Mehan argue only that the circuit court's judgment is sustainable on the alternative grounds asserted in their third and fourth Counts. They do not seek any different or additional relief than what the circuit court awarded them. In these circumstances, no cross-appeal was necessary or appropriate. Because the circuit court granted Ritter and Mehan all of the relief they requested, "they were not 'aggrieved' by that judgment." Rouner v. Wise , 446 S.W.3d 242, 249 n.5 (Mo. banc 2014). Even without filing a cross-appeal, "a 'respondent may attack erroneous rulings of the trial court for the purpose of sustaining a judgment in respondent's favor,' " and may " 'advance any argument here in support of the judgment.' " Id. at 249-50 n.5 (citations omitted); see also, e.g. , Porter v. City of St. Louis , 552 S.W.3d 166, 175 n.5 (Mo. App. E.D. 2018) ; Holman v. Holman , 228 S.W.3d 628, 633-34 (Mo. App. S.D. 2007) ; Rule 84.04(f) ("The respondent's brief may also include additional arguments in support of the judgment that are not raised by the points relied on in the appellant's brief.").

The Blunt decision expressly holds that, as part of the Secretary of State's obligation to review an initiative petition for compliance with the Constitution, § 116.120 "necessarily requires the Secretary of State to examine the proposal to insure it does not contain multiple subjects," 799 S.W.2d at 828. Here, the Secretary certified the Initiative Petition to appear on the November general election ballot after conducting the review required by § 116.120. Nevertheless, the Secretary's Brief in this Court states that "[t]he Secretary, participating as a Respondent, takes no position on appeal with respect to whether IP 2018-048 improperly contains more than one subject or amends more than article of the Missouri Constitution." Instead, the Secretary advises that, "[i]f the measure does violate the Constitution's single-subject and single-article requirements, the judiciary is the appropriate body to make that determination."

See, e.g. , State ex rel. Goldsworthy v. Kanatzar , 543 S.W.3d 582, 586 (Mo. banc 2018) (quoting Spradling v. SSM Health Care St. Louis , 313 S.W.3d 683, 688 (Mo. banc 2010) ).

In the Blunt case, the proponents of the initiative and the Secretary of State asserted that the subject addressed by the initiative petition at issue was "legislative matters," or "the regulation of public officials' conduct." 799 S.W.2d at 831-32. The Court observed that, "[a]s appellants would have us construe these subjects, they are extremely broad." Id. at 832. The Court also expressed the concern that, "[i]f multiple matters may be lumped together under excessively general headings, the single subject restriction of article III, § 50 would be rendered meaningless," and stated that it would not adopt such a construction of the phrase "one subject." Id. Despite the Court's reservations concerning the breadth of the "single subject" the proponents identified, Blunt plainly held that the article divisions of the constitution provided "strong evidence" of the meaning to be given to "one subject," and that the references in Article III, § 50 to "one ... article" and to "one subject" were "somewhat redundant."

Blunt also emphasized the breadth of the matters which could be construed to fall within "one subject" in its discussion of Buchanan v. Kirkpatrick , 615 S.W.2d 6 (Mo. banc 1981). Buchanan upheld what is popularly known as the "Hancock Amendment" against a single-subject challenge. Blunt explained:
The Buchanan case, more than any other, probed the outer limits of what matters may be included in a single constitutional proposition without violating the single subject rule. The proposition there under consideration amended article X, relating to taxation. Arguably, the proposal included six subjects: 1) a taxation lid on state government; 2) a spending lid on state government; 3) a directive that state government continue financial support of local government; 4) a tax lid on local government; 5) limits on local governments obtaining revenues based on assessments and property; and 6) a grant of original jurisdiction to the Supreme Court to hear taxpayer suits to enforce the provisions of the amendment. The proposal contained matters that had the effect of limiting the authority of the legislature and granted jurisdiction to the judiciary, subjects previously found in article III and article V, respectively. Nevertheless, the Court found a readily identifiable and reasonably narrow purpose that knitted all the diverse provisions together. The central purpose was to limit taxes and spending by state and local government. Buchanan v. Kirkpatrick , 615 S.W.2d at 13.
Blunt , 799 S.W.2d at 831.

We recognize that, from one perspective, it may appear that the Initiative Petition addresses two discrete topics: legislator ethics or legislative conduct on the one hand (the gift and campaign contributions limits; the limits on legislator fundraising; and the restrictions on post-legislative employment), and the reapportionment of legislative districts, on the other. But all of these issues fairly fall within the scope of the first subdivision of Article III of the current Constitution, and under Blunt , that is enough to render these matters "one subject." Notably, Ritter and Mehan do not argue that the Petition is invalid simply because it simultaneously addresses both legislator ethics and the reapportionment of legislative districts. Instead, their "one subject" challenge focuses on the purported effect of the Initiative Petition on non-legislative officials and candidates, and on other articles of the Constitution.

This includes § 2(e). Although it also refers merely to a "candidate," it plainly regulates that candidate with respect to "an expenditure that is deemed a contribution pursuant to this section. " Subsection 2(e) thus clearly relates to candidates for legislative office.

Ritter argues that the term "candidate" in proposed § 2(f) must be given the meaning assigned to the term in Article VIII, § 23.7(2) ("an individual who seeks nomination or election to public office"). But § 23.7 specifies that it defines certain terms solely "[a]s used in this section." Rather than looking to a definition of "candidate" which expressly does not apply, the more appropriate course is to look at the context in which the word appears in proposed § 2 of the Initiative Petition.

It is not at all clear that the non-partisan state demographer is properly characterized as an executive-branch employee. That individual's sole function is to prepare tentative legislative reapportionment plans and maps, for consideration by the House and Senate reapportionment commissions appointed by the Governor. Given that the demographer's sole role is to assist in legislative redistricting, it is arguable that the demographer is more properly characterized as a legislative-branch official.

We note that, in Boeving v. Kander , 496 S.W.3d 498 (Mo. banc 2016), the Missouri Supreme Court may have cast doubt on whether Article III, § 50 requires an initiative proponent to identify provisions which the measure would impliedly repeal. In Boeving , the Court stated:
This Court has been unwilling in the past to construe the constitutional provisions reserving to the people the power to propose constitutional amendments to impose any requirement that a measure's proponents identify every provision of the existing constitution that the proposed amendment might conceivably alter or affect if and when the proposed amendment is approved by the voters and put into operation. Nor is this Court willing to construe article III, section 50, to prohibit voters from approving or rejecting a constitutional amendment proposed by initiative petition simply because the proposed amendment may (if and when it goes into operation) be construed to alter or affect the application of a preexisting constitutional provision. By its terms, article III, section 50 is concerned only with what a proposed constitutional amendment "contains," not with what a proposed constitutional amendment will or might do if the voters approve it.
Id. at 509 (citations omitted). Whether or not a requirement to identify "directly conflicting" provisions of law exists under Article III, § 50 or not, the Initiative Petition still had to comply with the requirement of § 116.050.2(2) that it "[i]nclude all sections of ... the constitution which would be repealed by the measure...."

Ritter and Mehan also claim that §§ 3 and 7 of the Initiative Petition, which eliminate any role for the judiciary in the legislative redistricting process, directly conflict with Article V, § 4.3 of the Constitution, which specifies the manner in which the Supreme Court shall select the "fall-back" judicial reapportionment commission. Ritter and Mehan did not assert this implied repeal argument in the circuit court, however, and we accordingly do not address it. We note, however, that although the Initiative Petition may not have expressly told voters that the Petition would make it unnecessary for the Supreme Court to appoint a judicial reapportionment commission using the procedures specified in Article V, § 4.3, the Petition clearly states that the Petition would eliminate any role for a judicial commission in the legislative redistricting process, as specified in current Article III, §§ 2 and 7. Voters who read the Initiative Petition would be well aware that no judicial reapportionment commission would ever be appointed if the Initiative Petition passes.

The stay of the circuit court's judgment previously entered by this Court shall remain in effect until the issuance of this Court's mandate, or the issuance of a contrary order by the Supreme Court.